# CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY *v.* CHICAGO.

## ERROR TO THE SUPREME COURT OF THE STATE OF ILLINOIS.

No. 129. Argued November 6, 9, 1896. — Decided March 1, 1897.

This court has authority to reëxamine the final judgment of the highest court of a State, rendered in a proceeding to condemn private property for public use, in which after verdict a defendant assigned as a ground for new trial that the statute under which the case was instituted and the proceedings under it were in violation of the clause of the Fourteenth Amendment, forbidding a State to deprive any person of property without due process of law, and which ground of objection was repeated in the highest court of the State; provided the judgment of the court by its necessary operation was adverse to the claim of Federal right and could not rest upon any independent ground of local law.

The prohibitions of the Fourteenth Amendment refer to all the instrumentalities of the State, to its legislative, executive and judicial authorities, and, therefore, whoever by virtue of public position under a state government deprives another of any right protected by that amendment against deprivation by the State, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.

The contention that the defendant has been deprived of property without due process of law is not entirely met by the suggestion that he had due notice of the proceedings for condemnation, appeared, and was admitted to make defence. The judicial authorities of a State may keep within the letter of the statute prescribing forms of procedure in the courts and give the parties interested the fullest opportunity to be heard, and yet it might be that its action would be inconsistent with that amendment.

A judgment of a state court, even if authorized by statute, whereby private property is taken for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States.

The clause of the Seventh Amendment of the Constitution of the United States declaring that "no fact tried by a jury shall be otherwise reëxamined in any court of the United States than according to the rules of the common law" applies to cases coming to this court from the highest courts of the States in which facts have been found by a jury.

In a proceeding in a state court for the condemnation of private property for public use, the court having jurisdiction of the subject-matter and of the parties, the judgment ought not to be held in violation of the due

process of law enjoined by the Fourteenth Amendment, unless some rule of law was prescribed for the jury that was in absolute disregard of the right to just compensation.

In a proceeding in a state court in Illinois to ascertain the compensation due to a railroad company arising from the opening of a street across its tracks — the land as such not being taken, and the railroad not being prevented from using it for its ordinary railroad purposes, and being interfered with only so far as the right to its exclusive enjoyment for purposes of railroad tracks was diminished in value by subjecting the land within the crossing to public use as a street — the measure of compensation is the amount of decrease in the value of its use for railroad purposes caused by its use for purposes of a street, the use for the purposes of a street being exercised jointly with the company for railroad purposes.

While the general rule is that compensation is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business and wants of the community, or such as may be reasonably expected in the immediate future, mere possible or imaginary uses, or the speculative schemes of its proprietor, are to be excluded.

The railroad having laid its tracks within the limits of the city must be deemed to have done so subject to the condition — not, it is true, expressed, but necessarily implied — that new streets of the city might be opened and extended from time to time across its tracks as the public convenience required, and under such restrictions as might be prescribed by statute.

When a city seeks by condemnation proceedings to open a street across the tracks of a railroad within its corporate limits, it is not bound to obtain and pay for the fee in the land over which the street is opened, leaving untouched the right of the company to cross the street with its tracks, nor is it bound to pay the expenses that will be incurred by the railroad company in the way of constructing gates, placing flagmen, etc., caused by the opening of the street across its tracks.

All property, whether owned by private persons or by corporations, is held subject to the power of the State to regulate its use in such manner as not to unnecessarily endanger the lives and the personal safety of the people. The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the State by reasonable regulations to protect the lives and secure the safety of the people.

The expenses that will be incurred by the railroad company in erecting gates, planking the crossing and maintaining flagmen, in order that its road may be safely operated — if all that should be required — necessarily result from the maintenance of a public highway, under legislative sanction, and must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the State. Such expenses must be regarded as incidental to the exercise of the police powers of the State, and must be borne by the company.

THE case is stated in the opinion.

*Mr. John J. Herrick* for the Chicago, Burlington and Quincy Railroad Company. *Mr. J. W. Blythe* was on his brief.

*Mr. E. E. Osborne* for the Chicago and Northwestern Railway Company. *Post,* 258.

*Mr. John S. Miller* for the city of Chicago. *Mr. William G. Beale* was on his brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

The questions presented on this writ of error relate to the jurisdiction of this court to reëxamine the final judgment of the Supreme Court of Illinois, and to certain rulings of the state court which, it is alleged, were in disregard of that part of the Fourteenth Amendment declaring that no State shall deprive any person of his property without due process of law, or deny the equal protection of the laws to any person within its jurisdiction.

The constitution of Illinois provides that "no person shall be deprived of life, liberty or property, without due process of law." Art. 2, § 2. It also provides: "Private property shall not be taken or damaged for public use without just compensation. Such compensation, when not made by the State, shall be ascertained by a jury, as shall be prescribed by law. The fee of land taken for railroad tracks, without consent of the owners thereof, shall remain in such owners, subject to the use for which it is taken." Art. 2, § 13.

By the fifth article of the general statute of Illinois, approved April 10, 1872, and relating to the incorporation of cities and villages, it was provided that "the city council shall have power, by condemnation or otherwise, to extend any street, alley or highway over or across, or to construct any sewer under or through any railroad track, right of way or land of any railroad company (within the corporate limits); but where no compensation is made to such railroad company, the city shall restore such railroad track, right of way or land

to its former state, or in a sufficient manner not to have impaired its usefulness." 1 Starr & Curtis' Anno. Stat. 452, 472, Art. V, § 89.

The ninth article of the same statute declared that when the corporate authorities of a city or village provided by ordinance for the making of any local improvement authorized to be made, the making of which would require that private property be taken or damaged for public use, the city or village should file in its name a petition in some court of record of the county praying "that the just compensation to be made for private property to be taken or damaged" for the improvement or purpose specified in the ordinance be ascertained by a jury.

That statute further provided: "§ 14. Any final judgment or judgments, rendered by said court, upon any finding or findings of any jury or juries, shall be a lawful and sufficient condemnation of the land or property to be taken upon the payment of the amount of such finding as hereinafter provided. It shall be final and conclusive as to the damages caused by such improvement, unless such judgment or judgments shall be appealed from; but no appeal or writ of error upon the same shall delay proceedings under said ordinance, if such city or village shall deposit, as directed by the court, the amount of the judgment and costs, and shall file a bond in the court in which such judgment was rendered, in a sum to be fixed, and with security to be approved by the judge of said court, which shall secure the payment of any future compensation which may at any time be finally awarded to such party so appealing or suing out such writ of error, and his or her costs. § 15. The court, upon proof that said just compensation so found by the jury has been paid to the person entitled thereto, or has been deposited as directed by the court (and bond given, in case of any appeal or writ of error), shall enter an order that the city or village shall have the right, at any time thereafter, to take possession of or damage the property, in respect to which such compensation shall have been so paid or deposited, as aforesaid." 1 Starr & Curtis, 487 *et seq.*

All of these provisions became a part of the charter of the city of Chicago in 1875.

By an ordinance of the city council of Chicago approved October 9, 1880, it was ordained that Rockwell Street in that city be opened and widened from West 18th Street to West 19th Street by condemning therefor, in accordance with the above act of April 10, 1872, certain parcels of land owned by individuals, and also certain parts of the right of way in that city of the Chicago, Burlington and Quincy Railroad Company, a corporation of Illinois.

In execution of that ordinance a petition was filed by the city, November 12, 1890, in the Circuit Court of Cook County, Illinois, for the condemnation of the lots, pieces or parcels of land and property proposed to be taken or damaged for the proposed improvement, and praying that the just compensation required for private property taken or damaged be ascertained by a jury.

The parties interested in the property described in the petition, including the Chicago, Burlington and Quincy Railroad Company, were admitted as defendants in the proceeding.

In their verdict the jury fixed the just compensation to be paid to the respective individual owners of the lots, pieces and parcels of land and property sought to be taken or damaged by the proposed improvements, and fixed one dollar as just compensation to the railroad company in respect of those parts of its right of way described in the city's petition as necessary to be used for the purposes of the proposed street.

Thereupon the railroad company moved for a new trial. The motion was overruled, and a final judgment was rendered in execution of the award by the jury. That judgment was affirmed by the Supreme Court of the State. 149 Illinois, 457.

The motion by the city to dismiss the writ of error for want of jurisdiction will be first considered. If the right now asserted under the Constitution of the United States was specifically set up or claimed by the defendant in the state court, the motion to dismiss must be overruled. Rev. Stat. § 709.

. An examination of the statutes under which this proceeding was instituted will show that no provision is made for.an answer by the defendants. In *Smith* v. *Chicago & Western Indiana Railroad*, 105 Illinois, 511, 516, the Supreme Court of Illinois said there was no rule of law or of practice authorizing the filing of an answer to a petition for the condemnation of land under the eminent domain act of that State; that the proceeding was purely statutory; and that although the statute was very minute in all its details, specifically setting forth every step to be taken in the progress of a cause from its inception to its final determination, it did not contain any allusion to an answer by the defendants. .

It is not, therefore, important that the defendant neither filed nor offered to file an answer specially setting up or claiming a right under the Constitution of the United States. It is sufficient if it appears from the record that such right was specially set up or claimed in the state court in such manner as to bring it to the attention of that court.

Now the right in question was distinctly asserted by the defendant in its written motion to set aside the verdict and grant a new trial. Among the grounds for a new trial were the following: That the several rulings of the court in excluding proper evidence for the defendant, the statute under which the proceedings for condemnation were instituted, and the verdict of the jury and the judgment based upon it, were all contrary to the Fourteenth Amendment declaring that no State shall deprive any person of life, liberty or property without due process of law, nor deny to any person within its limits the equal protection of the laws.

When the trial court overruled the motion for a new trial and entered judgment it necessarily held adversely to these claims of Federal right.

But this is not all. In the assignment of errors filed by the defendant in the Supreme Court of Illinois, these claims of rights under the Constitution of the United States were distinctly reasserted.

It is true that the Supreme Court of Illinois did not in its opinion expressly refer to the Constitution of the United

States.  But that circumstance is not conclusive against the jurisdiction of this court to reëxamine the final judgment of the state court.  The judgment of affirmance necessarily denied the Federal rights thus specially set up by the defendant; for that judgment could not have been rendered without deciding adversely to such claims of right.  Those claims went to the very foundation of the whole proceeding so far as it related to the railroad company, and the legal effect of the judgment of the Supreme Court of the State was to deny them.  "The true and rational rule," this court said in *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, 143, "is that the court must be able to see clearly, from the whole record, that a certain provision of the Constitution or act of Congress was relied on by the party who brings the writ of error, and that the right thus claimed by him was denied."  In *Roby* v. *Colehour*, 146 U. S. 153, 159, it was said that "our jurisdiction being invoked upon the ground that a right or immunity, specially set up and claimed under the Constitution or authority of the United States, has been denied by the judgment sought to be reviewed, it must appear from the record of the case either that the right, so set up and claimed, was expressly denied, or that such was the necessary effect in law of the judgment."  *De Saussure* v. *Gaillard*, 127 U. S. 216, 234; *Brown* v. *Atwell*, 92 U. S. 327; *Chicago Life Ins. Co.* v. *Needles*, 113 U. S. 574, 577; *Sayward* v. *Denny*, 158 U. S. 180, 183.  There is, we conceive, no room to doubt that the legal effect of the judgment below was to declare that the rights asserted by the defendant under the National Constitution were not infringed by the proceedings in the case.  Consequently, the motion to dismiss for want of jurisdiction must be overruled, and we proceed to examine the case upon its merits.

The general contentions of the railroad company are —

That the judgment of the state court whereby a public street is opened across its land used for railroad purposes, and whereby compensation to the extent of one dollar only is awarded, deprives it of its property without due process of law contrary to the prohibitions of the Fourteenth Amendment; and,

That the railroad company was entitled by reason of the opening of the street to recover as compensation a sum equal to the difference between the value of the fee of the land sought to be crossed, without any restrictions on its right to use the land for any lawful purpose, and the value of the land burdened with a perpetual right in the public to use it for the purpose of a street subject to the right of the company, or those acquiring title under it, to use it only for railroad tracks or any purpose for which the same could be used without interfering with its use by the public.

The city contends that the question as to the amount of compensation to be awarded to the railroad company was one of local law merely, and as that question was determined in the mode prescribed by the constitution and laws of Illinois, the company appearing and having full opportunity to be heard, the requirement of due process of law was observed. If this position be sound, it is an end of the case, and we need not determine whether the state court erred in not recognizing the principles of law embodied in the instructions asked by the railroad company.

It is, therefore, necessary to inquire at the outset whether "due process of law" requires compensation to be made or secured to the owner of private property taken for public use, and also as to the circumstances under which the final judgment of the highest court of a State in a proceeding instituted to condemn such property for public use may be reviewed by this court.

It is not contended, as it could not be, that the constitution of Illinois deprives the railroad company of any right secured by the Fourteenth Amendment. For the state constitution not only declares that no person shall be deprived of his property without due process of law, but that private property shall not be taken or damaged for public use without just compensation. But it must be observed that the prohibitions of the amendment refer to all the instrumentalities of the State, to its legislative, executive and judicial authorities, and, therefore, whoever by virtue of public position under a state government deprives another of any right protected by that

amendment against deprivation by the State, " violates the constitutional inhibition ; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State." This must be so, or, as we have often said, the constitutional prohibition has no meaning, and " the State has clothed one of its agents with power to annul or evade it." *Ex parte Virginia*, 100 U. S. 339, 346–347 ; *Neal* v. *Delaware*, 103 U. S. 370 ; *Yick Wo* v. *Hopkins*, 118 U. S. 356 ; *Gibson* v. *Mississippi*, 162 U. S. 565. These principles were enforced in the recent case of *Scott* v. *McNeal*, 154 U. S. 34, in which it was held that the prohibitions of the Fourteenth Amendment extended to " all acts of the State, whether through its legislative, its executive or its judicial authorities" ; and, consequently, it was held that a judgment of the highest court of a State, by which a purchaser at an administration sale, under an order of a probate court, of land belonging to a living person who had not been notified of the proceedings, deprived him of his property without due process of law contrary to the Fourteenth Amendment.

Nor is the contention that the railroad company has been deprived of its property without due process of law entirely met by the suggestion that it had due notice of the proceedings for condemnation, appeared in court, and was admitted to make defence. It is true that this court has said that a trial in a court of justice according to the modes of proceeding applicable to such a case, secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice — the court having jurisdiction of the subject-matter and of the parties, and the defendant having full opportunity to be heard — met the requirement of due process of law. *United States* v. *Cruikshank*, 92 U. S. 542, 554 ; *Leeper* v. *Texas*, 139 U. S. 462, 468. But a State may not, by any of its agencies, disregard the prohibitions of the Fourteenth Amendment. Its judicial authorities may keep within the letter of the statute prescribing forms of procedure in the courts and give the parties interested the fullest opportunity to be heard, and yet

it might be that its final action would be inconsistent with that amendment. In determining what is due process of law regard must be had to substance, not to form. This court, referring to the Fourteenth Amendment, has said: "Can a State make anything due process of law which, by its own legislation, it chooses to declare such? To affirm this is to hold that the prohibition to the States is of no avail, or has no application where the invasion of private rights is effected under the forms of state legislation." *Davidson* v. *New Orleans,* 96 U. S. 97, 102. The same question could be propounded, and the same answer should be made, in reference to judicial proceedings inconsistent with the requirement of due process of law. If compensation for private property taken for public use is an essential element of due process of law as ordained by the Fourteenth Amendment, then the final judgment of a state court, under the authority of which the property is in fact taken, is to be deemed the act of the State within the meaning of that amendment.

It is proper now to inquire whether the due process of law enjoined by the Fourteenth Amendment requires compensation to be made or adequately secured to the owner of private property taken for public use under the authority of a State.

In *Davidson* v. *New Orleans,* above cited, it was said that a statute declaring in terms, without more, that the full and exclusive title to a described piece of land belonging to one person should be and is hereby vested in another person, would, if effectual, deprive the former of his property without due process of law, within the meaning of the Fourteenth Amendment. See also *Missouri Pacific Railway* v. *Nebraska,* 164 U. S. 403, 417. Such an enactment would not receive judicial sanction in any country having a written constitution distributing the powers of government among three coördinate departments, and committing to the judiciary, expressly or by implication, authority to enforce the provisions of such constitution. It would be treated not as an exertion of legislative power, but as a sentence—an act of spoliation. Due protection of the rights of property has been regarded as a vital principle of

republican institutions. "Next in degree to the right of personal liberty," Mr. Broom in his work on Constitutional Law says, "is that of enjoying private property without undue interference or molestation." (p. 228.) The requirement that the property shall not be taken for public use without just compensation is but "an affirmance of a great doctrine established by the common law for the protection of private property. It is founded in natural equity, and is laid down by jurists as a principle of universal law. Indeed, in a free government almost all other rights would become worthless if the government possessed an uncontrollable power over the private fortune of every citizen." 2 Story Const. § 1790; 1 Bl. Com. 138, 139; Cooley's Const. Lim. *559; *People* v. *Platt*, 17 Johns. 195, 215; *Bradshaw* v. *Rodgers*, 20 Johns. 103, 106; *Petition of Mt. Washington Road Co.*, 35 N. H. 134, 142; *Parham* v. *The Justices &c.*, 9 Georgia, 341, 348; *Martin et al., Ex parte*, 13 Arkansas, 198, 206 *et seq.*; *Johnston* v. *Rankin*, 70 N. C. 550, 555.

But if, as this court has adjudged, a legislative enactment, assuming arbitrarily to take the property of one individual and give it to another individual, would not be due process of law as enjoined by the Fourteenth Amendment, it must be that the requirement of due process of law in that amendment is applicable to the direct appropriation by the State to public use and without compensation of the private property of the citizen. The legislature may prescribe a form of procedure to be observed in the taking of private property for public use, but it is not due process of law if provision be not made for compensation. Notice to the owner to appear in some judicial tribunal and show cause why his property shall not be taken for public use without compensation would be a mockery of justice. Due process of law as applied to judicial proceedings instituted for the taking of private property for public use means, therefore, such process as recognizes the right of the owner to be compensated if his property be wrested from him and transferred to the public. The mere form of the proceeding instituted against the owner, even if he be admitted to defend, cannot convert the process used

into due process of law, if the necessary result be to deprive him of his property without compensation.

In *Fletcher* v. *Peck*, 6 Cranch, 87, 135–136, this court, speaking by Chief Justice Marshall, said : " It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, if the property of an individual fairly and honestly acquired, may be seized without compensation.  To the legislature all legislative power is granted ; but the question, whether the act of transferring the property of an individual to the public, be in the nature of legislative power, is well worthy of serious reflection."

In *Loan Association* v. *Topeka*, 20 Wall. 655, 663, Mr. Justice Miller, delivering the judgment of this court, after observing that there were private rights in every free government beyond the control of the State, and that a government, by whatever name it was called, under which the property of citizens was at the absolute disposition and unlimited control of any depository of power, was, after all, but a despotism, said : " The theory of our governments, state and national, is opposed to the deposit of unlimited power anywhere.  The executive, the legislative and the judicial branches of these governments are all of limited and defined powers.  There are limitations on such power which grow out of the essential nature of all free governments, implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name."  No court, he said, would hesitate to adjudge void any statute declaring that "the homestead now owned by A should no longer be his, but should henceforth be the property of B."  In accordance with these principles it was held, in that case, that the property of the citizen could not be taken, under the power of taxation to promote private objects, and, therefore, that a statute authorizing a town to issue its bonds in aid of a manufacturing enterprise of individuals was void because the object was a private, not a public, one.  See also *Cole* v. *La Grange*, 113 U. S. 1.

In the early case of *Gardner* v. *Newburgh*, 2 Johns. Ch.

162, there being no provision in the constitution of the State of New York on the subject, Chancellor Kent said that it was a principle of natural equity, recognized by all temperate and civilized governments, from a deep and universal sense of its justice, that fair compensation be made to the owner of private property taken for public use. In *Sinnickson* v. *Johnson*, 17 N. J. Law, 129, 145, it was held to be a settled principle of universal law, reaching back of all constitutional provisions, that the right to compensation was an incident to the exercise of the power of eminent domain; that the one was so inseparably connected with the other that they may be said to exist, not as separate and distinct principles, but as parts of one and the same principle; and that the legislature "can no more take private property for public use without just compensation than if this restraining principle were incorporated into and made part of its state constitution." These cases are referred to with approval in *Pumpelly* v. *Green Bay Co.*, 13 Wall. 166, 178, and in *Monongahela Nav. Co.* v. *United States*, 148 U. S. 312, 325, this court saying in the latter case : "And in this there is a natural equity which commends it to every one. It in nowise detracts from the power of the public to take whatever may be necessary for its uses; while on the other hand, it prevents the public from loading upon one individual more than his just share of the burdens of government, and says that, when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him."

In *Searl* v. *School District*, 133 U. S. 553, 562, and in *Sweet* v. *Rechel*, 159 U. S. 380, 398, the court said that it was a condition precedent to the exercise of the power of eminent domain that the statute make provision for reasonable compensation to the owner.

In *Scott* v. *Toledo*, 36 Fed. Rep. 385, 395–396, the late Mr. Justice Jackson, while Circuit Judge, had occasion to consider this question. After full consideration that able judge said : "Whatever may have been the power of the States on this subject prior to the adoption of the Fourteenth Amendment

to the Constitution, it seems clear that, since that amendment went into effect, such limitations and restraints have been placed upon their power in dealing with individual rights that the States cannot now lawfully appropriate private property for the public benefit or to public uses without compensation to the owner, and that any attempt so to do, whether done in pursuance of a constitutional provision or legislative enactment, whether done by the legislature itself or under delegated authority by one of the subordinate agencies of the State, and whether done directly, by taking the property of one person and vesting it in another or the public, or indirectly through the forms of law, by appropriating the property and requiring the owner thereof to compensate himself, or to refund to another the compensation to which he is entitled, would be wanting in that 'due process of law' required by said amendment. The conclusion of the court on this question is, that since the adoption of the Fourteenth Amendment compensation for private property taken for public uses constitutes an essential element in 'due process of law,' and that without such compensation the appropriation of private property to public uses, no matter under what form of procedure it is taken, would violate the provisions of the Federal Constitution." To the same effect are *Henderson* v. *Central Passenger Railway*, 21 Fed. Rep. 358, and *Baker* v. *Village of Norwood*, 74 Fed. Rep. 997.

In *Mount Hope Cemetery* v. *Boston*, 158 Mass. 509, 519, in which the Fourteenth Amendment was invoked against a statute requiring the city of Boston to transfer certain cemetery property owned by it to a particular company, the court said: "The conclusion to which we have come is, that the cemetery falls within the class of property which the city owns in its private or proprietary character, as a private corporation might own it, and that its ownership is protected under the constitutions of Massachusetts and of the United States, so that the legislature has no power to require its transfer without compensation " — citing the constitution of Massachusetts, Declaration of Rights, Article X, and the Fourteenth Amendment of the Constitution of the United States.

In his work on Constitutional Limitations, Mr. Cooley says : "The principles, then, upon which the process is based are to determine whether it is 'due process,' or not, and not any considerations of mere form. . . . When the government, through its established agencies, interferes with the title to one's property, or with his independent enjoyment of it, and its action is called in question as not in accordance with the law of the land, we are to test its validity by those principles of civil liberty and constitutional protection which have become established in our system of laws, and not generally by rules that pertain to forms of procedure merely. In judicial proceedings the law of the land requires a hearing before condemnation, and judgment before dispossession ; but when property is appropriated by the government to public uses, or the legislature interferes to give direction to its title through remedial statutes, different considerations from those which regard the controversies between man and man must prevail, different proceedings are required, and we have only to see whether the interference can be justified by the established rules applicable to the special case. Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs. . . . In every government there is inherent authority to appropriate the property of the citizen for the necessities of the State, and constitutional provisions do not confer the power, though they generally surround it with safeguards to prevent abuse. The restraints are, that when specific property is taken, a pecuniary compensation, agreed upon or determined by judicial inquiry, must be paid." pp. *356, *357. In his discussion as to the meaning and scope of the Fourteenth Amendment the same writer in his edition of Story on the Constitution, after observing that every species of individual property was subject to be appropriated for the special needs of either the State or national government, but that the power to appropriate was subject to the restriction, among others, that it must

not be exercised without making due compensation for whatever is taken, says: " Due process of law requires, first, the legislative act authorizing the appropriation, pointing out how it may be made and how the compensation shall be assessed; and, second, that the parties or officers proceeding to make the appropriation shall keep within the authority conferred, and observe every regulation which the act makes for the protection or in the interest of the property owner, except as he may see fit voluntarily to waive them." 2 Story Const. § 1956.

In our opinion, a judgment of a state court, even if it be authorized by statute, whereby private property is taken for the State or under its direction for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the Fourteenth Amendment of the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument.

It remains to inquire whether the necessary effect of the proceedings in the court below was to appropriate to the public use any property right of the railroad company without compensation being made or secured to the owner.

The contention of the railroad company is that the verdict and judgment for one dollar as the amount to be paid to it was, in effect, an appropriation of its property rights without any compensation whatever; that the judgment should be read as if in form as well as in fact it made no provision whatever for compensation for the property so appropriated.

Undoubtedly the verdict may not unreasonably be taken as meaning that, in the judgment of the jury, the company's property, proposed to be taken, was not materially damaged; that is, looking at the nature of the property and the purposes for which it was obtained and was being used, that which was taken from the company was not, in the judgment of the jury, of any substantial value in money. The owner of private property taken under the right of eminent domain obtains just compensation if he is awarded such sum as, under all the

circumstances, is a fair and full equivalent for the thing taken from him by the public.

If the opening of the street across the railroad tracks did not unduly interfere with the company's use of the right of way for legitimate railroad purposes, then its compensation would be. nominal.   But whether there was such an interfer. ence, what was its extent, and what was the value of that lost by the company as the direct result of such interference, were questions of fact which the State committed to the jury under such instructions touching the law as were proper and neces. sary.   It was for the jury to determine the facts, but it belonged to the court to determine the legal principles by which they were to be governed in fixing the amount of compensation to the owner.

Whatever may have been the power of the trial court to set aside the verdict as not awarding just compensation, or the authority of the Supreme Court of Illinois under the constitution and laws of the State to review the facts, can this court go behind the final judgment of the state court for the purpose of reëxamining and weighing the evidence, and of determining whether, upon the facts, the jury erred in not returning a verdict in favor of the railroad company for a larger sum than one dollar?   This question may be considered in two aspects : first, with reference to the Seventh Amendment of the Constitution, providing that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reëxamined in any court of the United States, than according to the rules of the common law "; second, with reference to the statute, Rev. Stat. § 709, which provides that the final judgment of the highest court of a State in certain named cases may be reëxamined in this court upon writ of error.

It is clear that the last clause of the Seventh Amendment is not restricted in its application to suits at common law tried before juries in the courts of the United States.   It applies equally to a case tried before a jury in a state court and brought here by writ of error from the highest court of the

State. One of the objections made to the acceptance of the Constitution as it came from the hands of the Convention of 1787 was that it did not, in express words, preserve the right of trial by jury, and that under it, facts tried by a jury could be reëxamined by the courts of the United States otherwise than according to the rules of the common law. The Seventh Amendment was intended to meet these objections, and to deprive the courts of the United States of any such authority. It could not have been intended thus to restrict the power of the courts of the United States to reëxamine facts tried by juries in the courts of the Union, and leave it open for those courts to reëxamine, in disregard of the rules of the common law, facts tried by juries empanelled in the state courts in cases which, by reason of the questions involved in them, could be brought under the cognizance of the courts of the United States.

In *The Justices* v. *Murray*, 9 Wall. 274, 278 — a case removed from a state court to a Circuit Court of the United States, after verdict in the state court, and brought from the latter court to this court by writ of error — the question was presented as to the constitutionality of so much of the 5th section of the act of March 3, 1863, c. 81, 12 Stat. 755, as authorized the removal of a judgment in a state court, in which the case was tried by a jury, to the Circuit Court of the United States for a retrial on the facts and the law. The argument was made that as by the construction uniformly given to the first clause of the amendment the suits there mentioned were only those in the Federal courts, the words "and no fact tried by a jury," mentioned in the second clause, relate to trial by jury only in such courts. But this court said: "It is admitted that the clause applies to the appellate powers of the Supreme Court of the United States in all common law cases coming up from an inferior Federal court, and also to the Circuit Court in like cases, in the exercise of its appellate powers. And why not, as it respects the exercise of these powers in cases of Federal cognizance coming up from a state court? The terms of the amendment are general, and contain no qualification in respect of the restriction

upon the appellate jurisdiction of the courts, except as to the class of cases, namely, suits at common law, where the trial has been by jury. The natural inference is that no other was intended. Its language, upon any reasonable, if not necessary interpretation, we think, applies to this entire class, no matter from what court the case comes, of which cogni-. zance can be taken by the appellate court. It seems to us also that cases of Federal cognizance, coming up from state courts, are not only within the words, but are also within the reason and policy of the amendment. They are cases involving questions arising under the Constitution, the laws of the United States and treaties, or under some other Federal authority; and, therefore, are as completely within the exercise of the judicial power of the United States, as much so as if the cases had been originally brought in some inferior Federal court. No other cases tried in the state courts can be brought under the appellate jurisdiction of this court or any inferior Federal court on which appellate jurisdiction may have been conferred. The case must be one involving some Federal question, and it is difficult to perceive any sensible reason for the distinction that is attempted to be made between the reëxamination by the appellate court of a cause coming from an inferior Federal court, and one of the class above mentioned coming up from a state court. In both instances the cases are to be disposed of by the same system of laws and by the same judicial tribu-. nal." It was, therefore, held that Congress could not authorize a Circuit Court of the United States, upon the removal of a case tried by a jury in a state court, to retry " the facts and law."

Upon the reasoning in the case just referred to, it would seem to be clear that the last clause of the Seventh Amendment forbids the retrial by this court of the facts tried by the jury in the present case. This conclusion is not affected by the circumstance that this proceeding is to be referred to the State's power of eminent domain, in which class of cases it has been held that, in the absence of express constitutional provisions on the subject, the owner of private property taken for public use cannot claim, as of right, that his compensation

shall be ascertained by a common law jury. The reason for this rule is, that before the establishment of the government of the United States it had been the practice in this country and in England to ascertain by commissioners, special tribunals and other like agencies, the compensation to be made to owners of private property taken for public use, and it was not to be supposed that the general provisions in American constitutions, national and state, preserving the right of trial by jury, superseded that practice. Lewis on Eminent Domain, 311, 312, and authorities cited. But, in Illinois, such practice is not permitted in cases of the condemnation of private property for public use. The state constitution of 1848 provided that "the right of trial by jury shall remain inviolate and shall extend to all cases at law without regard to the amount in controversy." Art. 13, § 6. The constitution of 1870 provides that "the right of trial by jury, as heretofore enjoyed, shall remain inviolate, but the trial of civil cases before the justices of the peace by a jury of less than twelve men may be authorized by law." Art. 2, § 5. And by the latter instrument, as we have seen, it is expressly provided that the just compensation required to be made to the owner of private property taken or damaged for public use "shall be ascertained by a jury as shall be prescribed by law." Art. 2, § 13. That the last-named provision prohibited the ascertainment of such compensation in any other mode than by a jury, is made clear by the decision of the Supreme Court of Illinois in *Kine* v. *Defenbaugh*, 64 Illinois, 291, in which it was adjudged that a provision in a statute of Illinois authorizing commissioners of highways, or three supervisors of the county on appeal from the commissioners, to ascertain the damages sustained by reason of the construction of a highway across the owner's premises, was superseded by the thirteenth section of article 2 of the state constitution — the court observing that a trial by jury was "a constitutional right of which the party may not be debarred either by the action or non-action of the legislature. *People* v. *McRoberts*, 62 Illinois, 38." The persons empanelled in this case to ascertain the just compensation due to the railroad

company constituted a jury as ordained by the constitution
of Illinois in cases of the condemnation of private property
for public use, and, being a jury within the meaning of the
Seventh Amendment of the Constitution of the United States,
the facts tried by it cannot be retried " in any court of the
United States otherwise than according to the rules of the
common law." The only modes known to the common law
" to reëxamine such facts, are the granting of a new trial by
the court where the issue was tried, or to which the record
was properly returnable, or the award of a *venire facias de
novo* by an appellate court, for some error of law which inter-
vened in the proceedings." *Parsons* v. *Bedford*, 3 Pet. 433,
447, 448 ; *Railroad Co.* v. *Fraloff*, 100 U. S. 24, 31.

To this may be added that Congress has provided that the
final judgment of the highest court of a State in cases of which
this court may take cognizance, shall be reëxamined upon writ
of error, a process of common law origin, which removes noth-
ing for reëxamination but questions of law arising upon the
record. *Egan* v. *Hart*, 165 U. S. 188. Even if we were of opin-
ion in view of the evidence that the jury erred in finding that
no property right, of substantial value in money, had been
taken from the railroad company, by reason of the opening of
a street across its right of way, we cannot, on that ground,
reëxamine the final judgment of the state court. We are per-
mitted only to inquire whether the trial court prescribed any
rule of law for the guidance of the jury that was in absolute
disregard of the company's right to just compensation.

We say, " in absolute disregard of the company's right to
just compensation," because we do not wish to be understood
as holding that every order or ruling of the state court in a
case like this may be reviewed here, notwithstanding our
jurisdiction, for some purposes, is beyond question. Many
matters may occur in the progress of such cases that do not
necessarily involve, in any substantial sense, the Federal right
alleged to have been denied ; and in respect of such matters,
that which is done or omitted to be done by the state court
may constitute only error in the administration of the law
under which the proceedings were instituted.

In *Lent* v. *Tillson*, 140 U. S. 316, 331, which was a case of the widening of a public street, for the cost of which bonds were issued, to be paid by taxation on the lands benefited, in proportion to the benefits, and in which it was alleged by a property owner that the local statute had been so administered as to deprive him of his property without due process of law, this court said : " Errors in the mere administration of the statute, not involving jurisdiction of the subject-matter and of the parties, could not justify this court, in its reëxamination of the judgment of the state court, upon writ of error, to hold that the State had deprived, or was about to deprive, the plaintiffs of their property without due process of law. Whether it was expedient to widen Dupont Street, or whether the board of supervisors should have so declared, or whether the board of commissioners properly apportioned the cost of the work, or correctly estimated the benefits accruing to the different owners of property affected by the widening of the street, or whether the board's incidental expenses in executing the statute were too great, or whether a larger amount of bonds were issued than should have been, the excess, if any, not being so great as to indicate upon the face of the transaction a palpable and gross departure from the requirements of the statute, or whether upon the facts disclosed the report of the commissioners should have been confirmed, are none of them issues presenting Federal questions, and the judgment of the state court upon them cannot be reviewed here."

In harmony with those views, we may say in the present case that the state court having jurisdiction of the subject-matter and of the parties, and being under a duty to guard and protect the constitutional right here asserted, the final judgment ought not to be held to be in violation of the due process of law enjoined by the Fourteenth Amendment, unless by its rulings upon questions of law the company was prevented from obtaining substantially any compensation. See also *Marchant* v. *Pennsylvania Railroad*, 153 U. S. 380.

The principal point of dispute between the parties was whether the railroad company, by reason of the opening of the street, was entitled to recover a sum equal to the difference

between the value of the land in question as land, without any restriction on its right to use it for any lawful purpose, and the value of the land when burdened with the right of the public to use it for the purposes of a street crossing.

In its opinion in this case the Supreme Court of Illinois says that when a city council, under the authority of the act of April 10, 1872, extends a street across railroad tracks or right of way, " it does not condemn the land of the railroad company nor prevent the use of the tracks and right of way." 149 Illinois, 457. We take this to be a correct interpretation of the local statute, and as indicating not only the interest acquired by the public through proceedings instituted for the extension of a street across the tracks and right of way of the railroad company, but also the extent to which the company was deprived, by the proceedings for condemnation, of any right in respect of the land. Such being the law of the State, it would necessarily follow that the jury, in ascertaining the amount of compensation, could not properly take as a basis of calculation the market value of the land as land. The land as such was not taken, the railroad company was not prevented from using it, and its use for all the purposes for which it was held by the railroad company was interfered with only so far as its *exclusive* enjoyment for purposes of railroad tracks was diminished in value by subjecting the land within the crossing to public use as a street. The Supreme Court of Illinois well said that " the measure of compensation is the amount of decrease in the value of the use for railroad purposes caused by the use for purposes of a street, such use for the purposes of a street being exercised jointly with the use of the companies for railroad purposes. In other words, the company is to be compensated for the diminution in its right to use its tracks caused by the existence and use of the street." 149 Illinois, 457.

But it was contended in the court below, and is here contended, that the land was subject to sale by the company for any lawful use; that after being condemned for purposes of a public street it could not be sold as land held for private use could be sold in the market; consequently, its salable value,

treating it as land simply, was practically destroyed by the opening of a public street across it.   Touching this point the state court, observing that a railroad company can only acquire land, whether by voluntary purchase or otherwise, for railroad purposes as defined in its charter, and that in this case the descriptions of the strips of land conveyed to the appellant, as set forth in the conveyances introduced in evidence, show that the strips were purchased for railroad right of way, and they have been ever since so used, said: "It is manifest that the appellant is restricted in its use of the right of way over which this street is to be extended to those purposes for which such right of way is now used.   The future use must be the same as the present use so long as the appellant continues to operate its railroad, unless the legislature shall permit it to change its route."   149 Illinois, 457, 461. The Supreme Court of Illinois, therefore, held that the trial court did not err in excluding evidence to show the general salable value of the right of way included in the crossing, or its general value for other uses than that to which it was applied.   According to this view of the powers of the railroad company, it is clear that the jury could not properly have taken into consideration the possibility of such legislative permission being granted; that is, the power of the legislature to permit a change of route, and the possibility of the exercise of that power, could not be elements in the inquiry as to the compensation to be now awarded to the railroad company.

But even if it were true that the company, so long as it operated its railroad, could without legislative permission take up its tracks placed across the land in question, and use the land for purposes other than for a right of way, the jury could not properly have taken into consideration the possibility that at some future time the company would adopt that course, and thereby put itself in condition, if no street were opened across it, to sell its land for what it was worth as land, freed from any public easement.   Such a possibility was too remote and contingent to have been taken into account.   There was nothing in the evidence, introduced or

offered and excluded, suggesting any probability that the
company intended to use or would in the near future use
the land within the crossing for any other purpose than as
a right of way.   While, as held in *Boom Co.* v. *Patterson,*
98 U. S. 403, 408, the general rule is that compensation " is
to be estimated by reference to the uses for which the prop-
erty is suitable, having regard to the existing business and
wants of the community, or such as may be reasonably ex-
pected in the immediate future," it is well settled that " mere
possible or imaginary uses, or the speculative schemes of its
proprietor, are to be excluded."   Pierce on Railroads, 217,
and authorities cited;  *Worcester* v. *Great Falls Manf. Co.,*
41 Maine, 159, 164;  *Dorlan* v. *East Brandywine & Waynes-
burg Railroad,* 46 Penn. St. 520, 525.

The company must be deemed to have laid its tracks
within the corporate limits of the city subject to the con-
dition — not, it is true, expressed, but necessarily implied —
that new streets of the city might be opened and extended
from time to time across its tracks as the public convenience
required, and under such restrictions as might be prescribed
by statute.   Suppose the city had many years ago acquired
the land in question by purchase or condemnation for the
purpose of extending and had extended a street over it, and
that the railroad company had thereafter acquired by con-
demnation the right to lay its tracks across the street upon
making just compensation to the city.   In ascertaining, in
such a case, the compensation due the city, would it not be
assumed, the street having once been opened, that the con-
venience of the public would always require it to be kept
open, and that, therefore, compensation was to be ascertained,
not upon the basis of the value of the city's land, as land,
when crossed by the railroad tracks, but upon the basis that
the land would always be a part of a public street?   Both
branches of this question must be answered in the affirma-
tive.   But they should not be so answered if the position of
the railroad company be sound; for, according to its con-
tention, the jury, in the case supposed, must have taken into
account the possibility that the city might at some future

time discontinue the street, and sell the land or devote it to other purposes. There was and is no more probability that the city, in the case supposed, would close the street than, in this case, that the railroad company will take up its tracks from the land in question. Such a probability was too remote to be regarded as an element in the inquiry as to compensation. When these proceedings were instituted the railroad company had an exclusive right to use the land in question for tracks upon which to move its cars, and the city did not propose to interfere in any degree with the enjoyment of that right, otherwise than by the opening of a street across the tracks for public use. To what extent was the value of the company's right to use the land for railroad tracks unduly diminished by opening across it a public street? Under all the circumstances, in view of the purpose for which the railroad company obtained the land, for which the land was in fact used, and for which it was likely to be always used — which purpose is the most valuable one for the railroad company — that was the only question to be determined by the jury. As the right to open a street across the railroad tracks was all that the city sought to obtain by the proceeding for condemnation, it was not bound to obtain and pay for the fee in the land over which the street was opened. If, prior to the institution of these proceedings, the railroad company had constructed upon the land embraced within the crossing buildings to be used in its business, it would have been necessary for the jury, in ascertaining the just compensation to be awarded, to take into consideration the value of such buildings. But no such case is before us. The case is simply one of the opening of a street across land with no buildings upon it, and used only for railroad tracks.

It is next contended that error of law was committed by the refusal of the court to allow the company to prove that in the event of the opening of the street it would be necessary, in order that the railroad be properly and safely operated, to construct gates and a tower for operating them, plank the crossing, fill between the rails, put in an extra rail, and to incur an annual expense of depreciations, main-

tenance, employment of gatemen, etc. It was not claimed that the railroad company could recover specifically on account of such expenditures, but that the proof of their being made necessary by the opening of the street was admissible for the purpose of showing the compensation due to the company. There are some authorities that seem to support the view taken by the railroad company, but we are of opinion that no error was committed in excluding the evidence offered.

The plaintiff in error took its charter subject to the power of the State to provide for the safety of the public, in so far as the safety of the lives and persons of the people were involved in the operation of the railroad. The company laid its tracks subject to the condition necessarily implied that their use could be so regulated by competent authority as to insure the public safety. And as all property, whether owned by private persons or by corporations, is held subject to the authority of the State to regulate its use in such manner as not to unnecessarily endanger the lives and the personal safety of the people, it is not a condition of the exercise of that authority that the State shall indemnify the owners of property for the damage or injury resulting from its exercise. Property thus damaged or injured is not, within the meaning of the Constitution, taken for public use, nor is the owner deprived of it without due process of law. The requirement that compensation be made for private property taken for public use imposes no restriction upon the inherent power of the State by reasonable regulations to protect the lives and secure the safety of the people. In the recent case of *N. Y. & N. E. Railroad* v. *Bristol,* 151 U. S. 556, 567, this court declared it to be thoroughly established that the inhibitions of the Constitution of the United States upon the impairment of the obligation of contracts, or the deprivation of property without due process or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of legislative power in securing the public safety, health and morals. "The governmental power of self-protection," the court said, "cannot be contracted away, nor can the exercise of rights granted, nor the use of property be withdrawn from the im-

plied liability to governmental regulation in particulars essential to the preservation of the community from injury." See *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 671.

In *Toledo, Peoria & Warsaw Railway* v. *Deacon*, 63 Illinois, 91, the Supreme Court of Illinois said: " The State has reserved to itself the power to enact all police laws necessary and proper to secure and protect the life and property of the citizen.    Prominent among the rights reserved, and which must inhere in the State, is the power to regulate the approaches to and the crossing of public highways, and the passage through cities and villages, where life and property are constantly in imminent danger by the rapid and fearful speed of railway trains.    The exercise of their franchises by corporations must yield to the public exigencies and the safety of the community."    And in *Illinois Central Railroad* v. *Willenborg*, 117 Illinois, 203, where the question was whether a railroad company could be required to construct a farm crossing over its road years after the road had been built, the court said: " The point is made, however, that these provisions are not obligatory on this corporation because they were enacted many years since it received its charter from the State.    This is a misapprehension of the law.    The regulations in regard to fencing railroad tracks, and the construction of farm crossings for the use of adjoining land owners, are police regulations in the strict sense of those terms, and apply with equal force to corporations whose tracks are already built, as well as to those to be thereafter constructed.    They have reference to the public security both as to persons and to property. . . .    No reason is perceived why, upon the same principle on which a railroad corporation may be required to fence its track and construct cattle guards, it may not be required also to construct farm crossings."

In *Chicago & Northwestern Railway Co.* v. *Chicago*, 140 Illinois, 309, 317–319, the question was whether, in a case where a city institutes a condemnation proceeding to open or extend a street across a railroad already constructed, the company owning such railroad was entitled to be allowed, as a

part of its just compensation, the amount of its expenses in constructing and maintaining the street crossing. In that case it appeared that the railroad was constructed prior to the above act of 1872 for the incorporation of cities and villages, and before the passage of the act of 1874, which required that thereafter at all railroad crossings of highways "and streets" the railroad companies should construct and maintain such crossings, and the approaches thereto, within their respective rights of way, so that at all times they should be safe as to person and property. 2 Starr & Curt. Ann. Stat. 1927. The court said: "Government owes to its citizens the duty of providing and preserving safe and convenient highways. From this duty results the right of public control over public highways. Railroads are public highways, and in their relations as such to the public are subject to legislative supervision, though the interests of their shareholders are private property. Every railroad company takes its right of way subject to the right of the public to extend the public highways and streets across such right of way. . . . If railroads so far as they are public highways are, like other highways, subject to legislative supervision, then railroad companies in their relations to highways and streets which intersect their rights of way are subject to the control of the police power of the State; that power of which this court has said that 'it may be assumed that it is a power coextensive with self-protection and is not inaptly termed the law of overruling necessity.' *Lake View* v. *Rose Hill Cemetery Co.*, 70 Illinois, 191. The requirement embodied in section 8, that railroad companies shall construct and maintain the highway and street crossings and the approaches thereto within their respective rights of way is nothing more than a police regulation. It is proper that the portion of the street or highway which is within the limits of the railroad should be constructed by the railroad company and maintained by it, because of the dangers attending the operation of its road. It should control the making and repairing of the crossing for the protection of those passing along the street and of those riding on the cars. . . . The items of expense for

which appellant claims compensation are such only as are involved in its compliance with a police regulation of the statute. It is well settled that 'neither a natural person nor a corporation can claim damages on account of being compelled to render obedience to a police regulation designed to secure the common welfare.' *Chicago & Alton Railroad* v. *Joliet, Lockport &c. Railroad,* 105 Illinois, 388. It has been held by this court in a number of cases that railroad corporations may be required to fence their tracks, to put in cattle guards, to place upon their engines a bell, and to do other things for the protection of life and property, although their charters contained no such requirements. *Galena & Chicago Union Railroad* v. *Loomis,* 13 Illinois, 548; *Galena & Chicago Union Railroad* v. *Dill,* 22 Illinois, 264; *Ohio & Mississippi Railroad* v. *McClelland,* 25 Illinois, 140; *Peoria & Pekin Union Railway* v. *Peoria & Farmington Railroad,* 105 Illinois, 110. . . . Uncompensated obedience to a regulation enacted for the public safety under the police power of the State is not a taking or damaging without just compensation of private property, or of private property affected with a public interest." See also *Mugler* v. *Kansas,* 123 U. S. 623, 668; *Boston & Maine Railroad* v. *County Commrs.,* 79 Maine, 386; *Thorpe* v. *Railroad,* 27 Vermont, 140; *Lake Shore Railway* v. *Cincinnati & Sandusky Railway,* 30 Ohio St. 604; *Portland & Rochester Railroad* v. *Deering,* 78 Maine, 61, 70; *State* v. *Chicago &c. Railway,* (Neb.), 45 N. W. Rep. 469; *N. Y. & N. E. Railway* v. *Waterbury,* 60 Connecticut, 1; *Charlotte, Columbia &c. Railroad* v. *Gibbes,* 142 U. S. 386, 393.

We concur in these views. The expenses that will be incurred by the railroad company in erecting gates, planking the crossing, and maintaining flagmen, in order that its road may be safely operated — if all that should be required — necessarily result from the maintenance of a public highway, under legislative sanction, and must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the State. Such expenses must be regarded as incidental to the exercise of the police powers of the State. What was obtained, and all that

was obtained, by the condemnation proceedings for the public was the right to open a street across land within the crossing that was used, and was always likely to be used, for railroad tracks.   While the city was bound to make compensation for that which was actually taken, it cannot be required to compensate the defendant for obeying lawful regulations enacted for the safety of the lives and property of the people.   And the value to the railroad company of that which was taken from it is, as we have said, the difference between the value of the right to the exclusive use of the land in question for the purposes for which it was being used, and for which it was always likely to be used, and that value after the city acquired the privilege of participating in such use by the opening of a street across it, leaving the railroad tracks untouched.   Upon that theory the case was considered by the jury, and the court did not err in placing it before them upon that basis as to compensation.

One of the instructions asked by the company, and refused by the court, was to the effect that if the land to be crossed by the proposed street was of such width and dimensions that it would be practicable for the company or those acquiring title under it to lay and operate other railroad tracks in addition to those already placed thereon, the company was entitled to recover as part of the compensation to be awarded the difference, if any, between the value of the strip for railroad purposes with the right to lay and operate thereon such additional tracks, and the value of the same for railroad purposes with the right to use and operate only the railroad tracks now on the same.   This instruction was properly refused, because it assumed, as matter of law, that the opening of the street across the existing railroad tracks prevented the company from laying additional tracks across the land within the crossing, if there was room for such tracks.   The right of the company to use the land or its right of way for as many tracks as it reasonably required for its business — if such right it had when the present proceedings were instituted — is not affected by the opening of the street in question.   The opening of the street across the company's land — the city not acquiring the

fee simple title — was necessarily subject to the right, if any, of the company to lay down additional tracks if necessary in the proper conduct of its business.

Another instruction asked by the company, and to the refusal of which it excepted, was to the effect that if the land of the railroad company to be crossed by the proposed street was used by it for railroad purposes as part of "its railroad and terminal facilities," and the value of such railroad and terminal facilities would be depreciated and lessened by the use of the land by the public for the purposes of a street (such use for the purposes of a street being subject, however, to the use of the land by the company for railroad purposes), then the railroad company was entitled to recover from the city a sum equal to such depreciation in value as damages to part of its land not taken or crossed by the proposed street. This instruction was properly refused. It was objectionable for the reason, if there were no other, that it was too general. The words "its railroad and terminal facilities" included the company's entire line of road and terminal facilities within, at least, the corporate limits of the city. The land within the crossing is three miles inside the city limits, about four miles from the passenger depot of the company and a thousand feet from its nearest freight depot. If the instruction last referred to had been given, the range of inquiry as to the sum due the company for what was taken from it would have been extended far beyond what was required or permissible in order to ascertain the amount of compensation.

It is further contended that the railroad company was denied the equal protection of the laws in that by the final judgment individual property owners were awarded, as compensation for contiguous property appropriated to the public use by the same proceeding, the value of their land taken, while only nominal compensation was given to the company — the value of its land, simply *as land*, across which the street was opened, not being taken into account. This contention is without merit. Compensation was awarded to individual owners upon the basis of the value of the property actually taken, having regard to the uses for which it was best adapted

and the purposes for which it was held and used and was likely always to be used. Compensation was awarded to the railroad company upon the basis of the value of the thing actually appropriated by the public — the use of the company's right of way for a street crossing, having regard to the purposes for which the land in question was acquired and held and was always likely to be held. In the case of individual owners, they were deprived of the entire use and enjoyment of their property, while the railroad company was left in the possession and use of its property for the purposes for which it was being used and for which it was best adapted, subject only to the right of the public to have a street across it. In this there was no denial of the equal protection of the laws, unless it be that the public cannot have a street across the tracks of a railroad company, except upon the condition precedent that it shall condemn and acquire the absolute ownership of the land, *leaving untouched the right of the company to cross it with its tracks.* We do not think the equal protection of the laws imposes such a burden upon the people of a city within the limits of which a railroad company has been permitted to lay its tracks.

We have examined all the questions of law arising on the record of which this court may take cognizance, and which, in our opinion, are of sufficient importance to require notice at our hands, and finding no error, the judgment is

*Affirmed.*

---

CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY *v.* CHICAGO. Error to the Supreme Court of Illinois. No. 130. Argued with No. 129. *Ante,* 226, 228. MR. JUSTICE HARLAN delivered the opinion of the court.

This was a proceeding for condemnation under the constitution and laws of Illinois similar to the one just disposed of. For the reasons stated in the above case, No. 129, the judgment of the Supreme Court of Illinois is

*Affirmed.*

MR. JUSTICE BREWER dissenting.

I dissent from the judgments in these cases.  I approve that which is said in the first part of the opinion as to the potency of the Fourteenth Amendment to restrain action by a State through either its legislative, executive or judicial departments, which deprives a party of his property without due compensation; also the ruling that "due process" is not always satisfied by the mere form of the proceeding, the fact of notice and a right to be heard.  I agree to the proposition that "a judgment of a state court, even if it be authorized by statute, whereby private property is taken for the State, or under its direction, for public use, without compensation made or secured to the owner, is, upon principle and authority, wanting in the due process of law required by the Fourteenth Amendment to the Constitution of the United States, and the affirmance of such judgment by the highest court of the State is a denial by that State of a right secured to the owner by that instrument."

It is disappointing after reading so strong a declaration of the protecting reach of the Fourteenth Amendment and the power and duty of this court in enforcing it as against action by a State by any of its officers and agencies, to find sustained a judgment, depriving a party — even though a railroad corporation — of valuable property without any, or, at least, only nominal, compensation.  It seems as though the denial which is so strenuously made as to the power of the State, through either its legislative, executive or judicial departments, is subject to one limitation; that is, the verdict of a jury.  The abundant promises of the fore part of the opinion vanish into nothing when the conclusion is reached.  They amount to a mere *brutum fulmen*.  It is a case frequent in all our experiences in life, where the promise and the performance are sadly at variance, and suggest those many sayings, some serious and some jocular, which are used to picture the grotesque incongruity so often manifested between the beginning and the end, the proclamation and the act.

For what is the result which is sustained and adjudged rightful by this decision?  The railroad company, which owns a tract of land within the limits of the city of Chicago, holds

it by deed from the original proprietors, having, therefore, the highest and best of all titles, a fee simple, and by virtue thereof a right to its exclusive use, with all the benefits and profits which attend thereon, is deprived of such exclusive use, forced to admit everybody to an equal use and occupation, to give to the public, indeed, all the use and occupation it has of any road or highway, including therein its power to require all owners of steam cars crossing such highways to plank at their own expense crossings, construct gates, employ gatemen and take all other necessary means to prevent accidents at such crossings, and receives for this only one dollar — merely nominal compensation. The property thus condemned is the private property of the company. *Missouri Pacific Railway* v. *Nebraska*, 164 U. S. 403–417. The individual owners of tracts alongside and similarly situated are, for being deprived of the exclusive use (for in neither case is the fee taken) of their property, awarded damages at the rate of about five thousand dollars for an equal area of ground, and this without being exposed to any further burden than the loss of the use of the property condemned.

It is no answer to say that the company only uses this piece of ground for its tracks and the passage of its trains, and may still use it in the same way. It is not the present use but the possibilities of use which determine the value of property. Can the owner of vacant land have it taken from him without compensation simply because at the moment he does not use it? As said by this court in *Boom Company* v. *Patterson*, 98 U. S. 403, 408 : "The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted ; that is to say, what is it worth from its availability for valuable uses." The value of this property to the railroad company, its owner, does not depend alone on the uses to which it is now put, but also on the uses to which the company may rightfully put it; and as shown by the testimony in this case that portion of the ground on either side of the tracks is available and valuable for station houses, offices, coal chutes,

elevator offices, signal towers, switch stands, etc., the possibility of use for which purposes is taken away when the land is appropriated for a highway. The claim that the leaving of the present use of his property to the owner destroys the right of compensation is a proposition which to my mind is simply monstrous. Could another railroad company or an individual condemn and take from this company any use of its tracks, with only nominal compensation, simply because its own use was left to the company? And yet, if the taking of a crossing without compensation can be defended on this ground, why may not the taking of the use of the tracks without compensation also be defended?

Neither, as I submit, can the large matter of damages by liability to the expense of planking between the tracks, establishing gates, hiring gatemen and resorting to all other necessary means of guarding against accidents at the crossing, be ignored in any just estimate of compensation. It is no sufficient answer to say that wherever a crossing has been rightfully established the public may legally compel the company at its own expense to provide these means of protection. The company is liable to no such burden until the highway is opened. As long as the public had no right of crossing, the company was under no burden. The establishment of the crossing, the taking of the property for a highway, creates the right on the part of the public to cast the burden upon the company, and it seems to me monstrous to say that the public can create the right to cast a large burden of expense upon the company and yet be under no obligations to compensate therefor. It amounts simply to this, that the city says to the railroad company I will take your property and use it for a highway and pay you nothing for it or for your liability to bear such a burden of expense as I may see fit to cast upon you hereafter in order to protect that crossing against accident, and I can do all this without compensation, because if I had owned the property in the first place, and simply given you permission to cross my highway, I could compel you to bear such burden. The right to impose a burden after a public ownership is created is used as a justification

for creating the public ownership without compensation. I cannot agree to any such proposition.

This question was presented to the Supreme Court of Kansas in *Kansas Central Railroad Co.* v. *Commissioners*, 45 Kansas, 716, 724, where a highway was sought to be established across a railroad track, without any compensation, and the court denied the claim, saying: " Whether the duty imposed upon the railroad company of constructing cattle guards, fences, signs, etc., can be or is imposed upon it under the police power of the State, makes no difference in this case. If the highway should not be established across the railroad company's right of way, then it would not be necessary for any of these things to exist; but if a highway is so established, then the duty under the statutes immediately springs into existence, requiring the railroad to so construct these things. The establishment of the highway is therefore the cause of all these additional burdens being imposed upon the railroad company. And must the railroad company bear these burdens and suffer these losses without compensation? Why should it be treated differently from others who have interests in real estate ? All others having interests in real estate are entitled to compensation for losses resulting from the location of a public highway interfering with their free and rightful use of such interests. *Smith County Commissioners* v. *Labore*, 37 Kansas, 480, 484 *et seq.*" See also the many cases cited in the opinion. Among them is *Grand Rapids* v. *Grand Rapids &c. Railroad*, 58 Michigan, 641, 648, in which it was said by Campbell, C. J.: "The damage done to a railroad by having a highway run across it must necessarily include all the additional expense entailed by such a crossing, which in a city may involve a considerable outlay in making the crossing safe, and providing guards against accidents." Again, in *Chicago & Grand Trunk Railway* v. *Hough*, 61 Michigan, 507, 508, the court observed, speaking by the same Chief Justice: " If a railroad interferes with an existing highway, it must bear all the expense of crossing and restoring the highway as far as practicable to safe condition, and the fencing and cattle-guards are necessary for that purpose.

But, as pointed out in 52 Michigan, 277, when a new highway is created, then it belongs to those who create it to bear the expense of making the crossing in the condition necessary to meet all the expense and danger which it occasions."

Indeed, in Illinois, as between two railroads, one seeking to obtain the right of crossing over the tracks of the other, the court, in *Chicago & Alton Railroad* v. *Springfield & N. W. Railroad*, 67 Illinois, 142, well said : " Appellants are entitled to such a sum for damages, to be paid by appellee in money as will enable appellants to construct and keep in repair all such works as may be necessary to keep their track in a safe and secure condition. Nothing short of this can amount to the ' just compensation ' provided by law." ·

I do not care to enlarge upon this matter. These propositions seem to me so absolutely clear that the mere statement of them ought to carry conviction. And after a declaration by this court that a State may not through any of its departments take private property for public use without just compensation, I cannot assent to judgments which in effect permit that to be done.

THE CHIEF JUSTICE took no part in the consideration or decision of these cases.