## Emaus Borough v. Security Trust Company. No. 1.

*Boroughs—Road law—Widening of streets—Ordinance—Building-lines—Compensation to owners—Dedication—Equity—Acts of May 14, 1915, and June 29, 1923.*

1. Where, in 1874, a borough by ordinance fixed the building-line of a street, but did not pay abutting owners compensation or enter a bond for payment of the same, the ordinance amounts merely to notice to the owners of the land affected that damages will not be allowed them if they build thereon.

2. In such case, the borough cannot restrain by injunction an owner who attempts to build within the restricted area.

3. The borough may proceed under the Act of May 14, 1915, P. L. 312, or it may lawfully appropriate the land to the width contemplated by the Ordinance of 1874, or it may proceed under the Act of June 29, 1923, P. L. 949, to establish building-lines.

4. Prior to the Act of June 29, 1923, boroughs possessed no power to establish building-lines, and, therefore, the Ordinance of 1874 was not an exercise of police power.

5. When a municipality seeks actually to open a street previously widened by ordinance, it must pay the owner damages or enter a bond to provide for such payment.

6. The mere setting back of a building from a street by the owner for his own convenience or comfort is not of itself a dedication of the land thrown out, and he may reclaim it at will.

Bill in equity for an injunction. C. P. Lehigh Co., June T., 1923, No. 2.

*Thomas F. Diefenderfer, R. W. Iobst, Oliver W. Frey* and *Henry L. Snyder,* for plaintiffs.

*Butz & Rupp,* for defendants.

RENO, P. J.—On June 20, 1923, the complainants filed their bill of complaint with the necessary affidavits and bond, praying for an injunction. The then President Judge, Hon. Clinton A. Groman, thereupon granted a preliminary injunction and designated June 25, 1923, as the date for hearing motions to continue or dissolve. On that date and on July 3, 1923, testimony on behalf of plaintiffs was heard, and on July 13, 1923, Judge Groman filed an opinion overruling the motion to dissolve the preliminary injunction. Testimony was further taken on behalf of plaintiffs and defendants on July 31, 1923, Aug. 8th and Aug. 13, 1923, which testimony was apparently regarded as for the final hearing. The requests for findings of fact and conclusions of law having been filed, Judge Groman heard argument thereon on Nov. 5, 1923. His term as judge expired without the filing of answers to the requests. Nor did he file any opinion in the case except that to which reference has already been made.

After the term of the writer as President Judge commenced, the case was orally argued before him upon the requests for findings of fact and conclusions of law. There was, therefore, cast upon him the duty of finding facts from a written record without having enjoyed the benefit of hearing and seeing the witnesses. As though this circumstance was not of itself a sufficient handicap, he found himself compelled to work with a record from which a number of exhibits were missing and in which were contained a number of rulings upon the admission or rejection of evidence which he would not have made had he conducted the hearings. Moreover, in the solution of a case which required the finding of facts he was obliged to abstract them without the aid of briefs upon the facts. Add to this the omission of counsel on both sides to follow the procedure required by the equity rules (Rule 62, revised), and some small appreciation of the labors cast upon him may be realized.

This experience warrants him in stating that hereafter no equity case will be regarded as ready for argument unless and until the requests for findings of fact and conclusions of law have been subjected to the processes of criticism provided for by the rules.

Indeed, the more satisfactory course would have been to have ordered a rehearing. But this would have subjected litigants to another delay and to increased expenses, and, complying with the request of counsel on both sides, findings of fact and conclusions of law are now presented in the same manner as if the case had been actually heard by the writer.

## *Findings of fact.*

In addition to the answers to the requests for findings of fact, which, when affirmatively found, are also made a part of the findings of fact, I find and state the following material facts:

1. The Borough of Emaus was incorporated Aug. 1, 1859, under the Act of April 3, 1851, P. L. 320.

2. The Security Trust Company of Emaus, Pennsylvania, is a corporation under the laws of the State of Pennsylvania and has its principal office in the Borough of Emaus.

3. By deed dated Oct. 27, 1921, and duly recorded, Oliver M. Kemmerer and wife conveyed to Security Trust Company premises situate at the northwest corner of Main Street and Short Alley, in the Borough of Emaus, having a frontage of 33.31 feet on Main Street and 37.65 feet on Chestnut Street.

4. The deed contains no restrictions as to the location of buildings upon the premises, nor is there any such restriction in any of the deeds composing the chain of title.

5. The Town Council of the Borough of Emaus, in 1874, by Ordinance No. 14, ordained as follows:

"That the building-line or house-line of Main Street, between First Street and the intersection of Main Street and Chestnut Street, shall be as follows, namely, upon the east side of said street the houses between said First Street and intersection of Fourth Street are to be the building-line, and all subsequent building or buildings are not to extend beyond said line or range, but are to be built in and range or line, and on the west side of Main Street, between First Street and Chestnut Street, the houses are taken as the building-line or range-line, and all subsequent building or buildings are not to be extended beyond the said range or building-line, but are to be ranged with those prior built."

6. The Security Trust Company of Emaus, Pa., on May 9, 1923, obtained a permit to erect a one-story bank on Main Street, containing 50 feet in front and 60 feet in depth, and paid the sum of $1.50 for fees for the same.

7. After securing said permit, defendants began the erection of a building upon the premises, the stakes for which were placed 16 feet west of the western curb-line of Main Street and 12 feet north of the curb-line on Chestnut Street, the width of the pavement on both streets being 8 feet, but the front of the proposed building extends approximately 9 or 10 feet beyond the building-line referred to in Ordinance No. 14, and 9 or 10 feet beyond that line to which other buildings conform on Main Street, between First and Chestnut Streets.

8. Prior to the enactment of Ordinance No. 14, for a long period of years, extending (perhaps) back to the time when the village of Emaus was settled by the Moravians, as well as since the enactment of said ordinance, owners of premises abutting on Main Street erected buildings thereon in substantial

conformity to the line which the ordinance refers to, and the building upon premises of Security Trust Company which is to be replaced with the banking house now under construction conformed to said line, although to the front of that building there was a porch, a lawn planted with trees, and a cement coping surmounted by an iron fence, which coping was along the western edge of the eight-foot wide pavement on Main Street.

9. The space between the western curb-line and the building-line is and always has been used by the owners of the premises as private property; that is, they annexed to their buildings porches and bay-windows and other projections, erected and maintained iron, wooden or hedge fences, walls, copings, etc., along the western pavement-line and between said pavement-line and the buildings planted grass, shrubbery, plants, flowers, trees, some of which were terraced, or at least were considerably elevated above the level of the pavement. No part of this space between pavement and house was used for public travel, except that walks extending from the houses to the pavement were used for egress thereto and regress therefrom, and except, also, that in front of certain business buildings the whole space was paved.

10. The width of Main Street as fixed by the official map of the borough, adopted Nov. 10, 1875, is 50 feet from curb-line to curb-line, with 8 feet wide pavements or sidewalks on either side, and the building-lines shown on said map extend on either side approximately 25 feet back of the curb-lines.

11. No compensation was ascertained, assessed or paid for the land between the western line of the pavement and the building-line.

*Discussion.*

1. Effect of Ordinance No. 14.

The borough contends that the effect of Ordinance No. 14 was to widen Main Street, and that, therefore, the building now in course of erection encroaches upon and within the lines of the widened street and is enjoinable at the instance of the borough. The chancellor who granted the preliminary injunction and heard the testimony upon the motion to dissolve it adopted their view, and in the opinion filed July 13, 1923, overruling the motion to dissolve, said:

"The Borough Ordinance of 1874, in effect, widened Main Street from the paving-line to the house-line; the Act of 1851 authorized the laying out and widening of streets, alleys and courts. This being so, the action of borough council was within the powers conferred by the Act of 1851."

The conclusion now reached does not require dissent from the view that the effect of the ordinance was to widen Main Street, although such effect is not discernible upon the face of the ordinance. The ordinance is entirely silent as to the width of Main Street. It makes no change of width. It leaves Main Street as it finds it, only placing upon it building-lines on either side. Indeed, all that the ordinance does is to recognize as already existing certain building-lines and prohibiting future erections within the existing lines which the owners of the premises abutting on Main Street had voluntarily created.

There is, of course, considerable force to plaintiffs' contention that since the boundaries of a street are its building-lines (Pennsylvania R. R. Co. *v.* Pittsburgh Grain Elevator Co., 50 Pa. 499), an ordinance which fixes building-lines likewise fixes the width of a street. Hence, without now inquiring whether, for that purpose, Ordinance No. 14 is not invalid because indefinite, in that the width of Main Street must be ascertained from the position of buildings upon the ground rather than from an inspection of the ordinance

itself, the contention can be and is adopted here.  But it does not follow from that circumstance that the borough is entitled to relief.

2. No compensation paid to abutting owners.

Unquestionably, in 1874, the borough possessed power not only to lay out and open streets, but also to widen them: Act of April 3, 1851, § 2, cl. 2, P. L. 320.  Also, it possessed the power to "prohibit the erection or construction of any building or work, excavation or other obstruction to the opening, widening, straightening and convenient use thereof:" Act of April 3, 1851, § 2, cl. 3, P. L. 320.  Apart from the authority thus conferred upon the borough to prohibit the erection of buildings within the lines of streets, the Act of 1851 itself (section 27, clause 4) provided that "it shall not be lawful for any owner . . . of lands . . . to erect any buildings within the lines of streets . . . laid out, widened or straightened, or ordained to be laid out, widened or straightened, after due notice thereof, and if any such erection . . . shall be made, no allowance shall be made therefor in the assessment of damages, but the loss or injury sustained by the laying out of the same or the enactment of such widening or straightening thereof shall be determined by agreement of the parties or by appeal to the court," etc.

Thus regarding Ordinance No. 14 as widening Main Street, it was certainly competent for the borough to prohibit the erection of buildings within the lines thereby fixed as the boundaries of the street, upon the penalty that if such buildings were erected, no damages for injuries to them can be recovered when the borough actually widens the street.  The case, therefore, comes to this, that Main Street having been ordained to be widened to the extent of the land comprehended within the building-lines, and having prohibited the erection of buildings beyond such lines, the Security Trust Company will erect buildings thereon at its peril, i. e., when Main Street is actually opened upon the ground and damages sustained thereby are paid, the Security Trust Company will not be allowed to recover damages for that portion of its building within the lines of the street, and that portion must, nevertheless, be removed.

However, until such time as the borough proceeds to widen Main Street by apt proceedings, the Security Trust Company may build upon any portion of its land and the borough cannot enjoin it.  It is not enough that a municipality enact an ordinance opening or widening a street.  The only effect flowing from such action is to notify property owners of the municipality's intention to acquire in the future the lands thus designated by map or ordinance and to warn them of the peril of building within the lines of the streets so plotted: District of Pittsburgh, 2 W. & S. 320; Forbes Street, 70 Pa. 125; Bush v. McKeesport, 166 Pa. 57; Philadelphia Parkway, 250 Pa. 257.  And, although such action in effect amounts to a taking of land because the owner is restrained from the entire beneficial enjoyment of it (Cf. 3 Dillon on Municipal Corporations, § 1029), yet, in Pennsylvania, such legislation has been repeatedly held constitutional: Harrison's Estate, 250 Pa. 129.  But when the municipality proceeds further, when it seeks actually to open or widen the street upon the ground and to take physical possession of it and to impose upon it the incidents of public use, it must either pay or secure compensation: Constitution of Pennsylvania, art. XVI, § 8; Parkesburg Borough Streets, 124 Pa. 511.  Until that is done, the municipality is a mere trespasser upon the land, and, having no rights in respect to it, may be enjoined from proceeding until compensation is made or secured: Strohl v. Ephrata Borough, 178 Pa. 50.  It follows inevitably that unless and until the borough shall have proceeded in accordance with law to make compensation,

it has no right to the land between the pavement and the house-line, and that its legislation concerning it amounts merely to a notice of an intention subsequently to acquire such rights.

For this purpose, even prior to the Borough Code of 1915, methods were provided for the ascertainment and payment of such damages. The Act of April 3, 1851, § 27, cl. 3, P. L. 320, provided "that such streets shall not be opened for public use until the damages shall be liquidated," and "that like proceedings shall be had for the opening, widening . . . of the . . . streets laid out and ordained, . . . as are provided by law for the laying out and opening of public roads within this Commonwealth." That is, under the Act of 1851, streets were to be widened in accordance with the procedure established by the General Road Law of 1836 for the opening of roads. This was followed by the Act of April 22, 1856, P. L. 525, providing for the appointment of viewers by the Court of Quarter Sessions, and the Act of May 16, 1891, P. L. 75, provided that "in case the compensation for the damages accruing therefrom (i. e., for widening a street) have not been agreed upon, any Court of Common Pleas of the county . . . may appoint viewers," etc. This enumeration of applicable statutes will not be understood as inclusive; there are others under which the borough might have proceeded; but the enumeration is sufficient to indicate the legislative intention, both before and after the adoption of the Constitution of 1874, to prohibit the taking of lands for widening streets except by lawful proceeding, having as their object the ascertainment and payment of the attendant damages.

It is patent that there never were such proceedings. There was no agreement with the property owners, no release of damages, no payment of damages, and no jury of view to ascertain the damages. At least, the record discloses none of these factors, and counsel for the borough frankly acknowledge that they could show none. The burden of establishing these factors was undoubtedly upon the borough, which was asserting the existence of the street. The defendants, apparently, were willing to assume the burden and show that no payment had in fact been made, but the chancellor, for reasons not disclosed, declined to receive this testimony upon the objection of the borough. In these circumstances, we may safely assume that proceedings to appropriate and condemn this land to public use were never instituted.

The lapse of many years since the passage of Ordinance No. 14 does not change the situation. The statute of limitations is generally not applicable to proceedings to assess damages for property taken in the exercise of the right of eminent domain: Philadelphia Parkway, 250 Pa. 257. Even if it did apply, it would run, not from the passage of the ordinance, but only from that time when some act was done or notice or demand made affecting or relating to the possession or appropriation of the land (Volkmar Street, 124 Pa. 320), or until the street was opened or widened or the municipality did some other unequivocal act which indicated that the possession of the owner was about to be disturbed: Whitaker v. Phœnixville Borough, 141 Pa. 327; Re Chestnut Street, 118 Pa. 593. Nor is there any room for argument that the public acquired rights to the land by prescription. Assuming that the land had been used by the public, which hereafter will be shown not to be true, such user must be hostile and adverse for the period of twenty-one years before the doctrine of presumption is applicable: Root v. Com., 98 Pa. 170. These factors are, of course, entirely absent.

3. Is Ordinance No. 14 an exercise of police power?

The borough seeks to avoid the consequences of its failure to proceed to the ascertainment and payment of compensation by its further contention that

Ordinance No. 14 was an exercise of its police power, and that that power may be exercised without making compensation for lands taken or injured.

This is, of course, a shift of position. In one breath, the borough vehemently insists that Ordinance No. 14 is equivalent to widening the street. If so, that constitutes an exercise of its corporate power to open streets under the right of eminent domain. But almost in the same breath it asserts that building-lines may be established in the exercise of the police power to maintain the health, safety and comfort of its citizens. In other words, when its parapets are assaulted and reduced by showing that its exercise of the power of eminent domain was faulty because not complete, it takes refuge within the citadel of its police power. But it is necessary to wage battle there.

There is no doubt that when the police power is exercisable at all, its exercise is not restrained because its effect is to take property for a public use without making compensation: New Orleans Gas Light Co. v. Drainage Commission, 197 U. S. 453; Chicago R. R. Co. v. Chicago, 166 U. S. 226; Nolan v. Jones, 263 Pa. 124. Upon this theory, legislation concerning party-walls (Jackman v. Rosenbaum Co., 263 Pa. 158), pillars in coal mines (Com. v. Plymouth Coal Co., 232 Pa. 141), the erection of wooden buildings in cities (Respublica v. Duquet, 2 Yeates, 493; Klingler v. Bickel, 117 Pa. 326), the incidents of riparian ownership (Com. v. Emmers, 221 Pa. 298), although they are restraints upon the uses to which real estate may be put, have been upheld as constitutional. Perhaps it shall also be held that the establishing of building-lines is likewise within the police power; certainly there is little difference in principle or in the substance of the restraint imposed by a restriction of the height to which a building may ascend and one restricting its length or width. Cf. Welch v. Swasey, 214 U. S. 91, where legislation prohibiting erection of buildings beyond a certain height was upheld against the claim that it deprived the owner of the profitable use of his property without compensation. But the instant case calls for no adjudication of the applicability of this principle, and since this question may later arise between these same parties, it is desirable to avoid anything that even remotely approaches a decision of it. For, admittedly, prior to the Act of June 29, 1923, P. L. 949, boroughs possessed no power to establish building-lines, and, hence, any inquiry as to whether the power to establish such lines is exercisable under the right of eminent domain or under the police power is beside the point. In 1874, the only power residing in the borough was a power to open and widen streets, which power must be exercised in accordance with the right and limitations of eminent domain. Ordinance No. 14 was, therefore, an exercise of that power or it was nothing. If the former, compensation must be made; if the latter, ex nihilo nihil fit. Cf. Wright v. France, 279 Pa. 22; Perry's Court, 10 Phila. 27; Penn Mutual Life Ins. Co.'s Appeal, 9 Pa. Superior Ct. 593.

4. Was there a dedication?

Nor is the borough more fortunate with its contention that the lands between the pavement and the house-line were dedicated by the owners thereof to the borough, and that thereby the borough is excused from making compensation for them.

The findings of fact reveal the uses to which these lands have been put, and not by the wildest stretch of imagination could it be said that the owners have devoted and, therefore, dedicated them to a public use. Indeed, they have done just the reverse. They have erected fences separating the pavement from the land, walks lead from their doors to the pavement, the lands have been terraced, planted with flowers, plants and trees, affording to the owner

a prospect at once inviting and beautiful. But beyond sharing a view of this delightful prospect with the owner, the public exercised no rights concerning it. It could not walk upon it except to visit the owner. It could not travel upon it, drive bicycles, automobiles, vehicles or animals across it, nor do any of the acts incident to the use of a public highway. The public had no rights concerning these lands except those which it always enjoys when a land owner beautifies his premises by placing his dwelling behind the usual pavement-line and maintains a well-kept lawn.

Clearly, this does not constitute a dedication of the property to a public use. The space was "left open for the accommodation, not of the public, but of the owner:" Gowen *v.* Philadelphia Exchange, 5 W. & S. 141. In other words, "there can be no dedication, strictly speaking, to private uses, nor even to uses public in their nature, but the enjoyment of which is restricted to a limited part of the public. The use must be not only intended for the whole public, but one which the whole public may enjoy:" 18 Corpus Juris, 50.

Our own cases accord with this statement. Not to mention again Gowen *v.* Philadelphia Exchange, 5 W. & S. 141, which is a direct answer to the borough's contention, there is Weiss *v.* South Bethlehem Borough, 136 Pa. 294, where it was held that dedication is a matter of intention, and that a mere permissive use by the public of a piece of ground left open by the owner and used by him in his own business or for his own convenience is not a dedication to public use. In Griffin's Appeal, 109 Pa. 150, a case very similar to the one at bar, the City of Scranton sought to enjoin the defendant from erecting a fence along the side of Main Street, claimed by the city to extend into and obstruct the street. It appeared that the original owner of the land had set his fence back from the highway and used the intervening space for purposes of his own convenience until his death. Fifteen years after his death and thirty years after the fence had been set back, the defendant, who had subsequently acquired the title, attempted to put the fence back to its original place. The city claimed that the original owner's act constituted a dedication, but the Supreme Court held, reversing the court below which had granted an injunction, that there is no dedication to land to public use when the same is used by the public jointly with the owner and by his sufferance, no matter how long such joint use continued. In Neill *v.* Gallagher, 10 Phila. 172, cited with approval in Griffin's Appeal, 109 Pa. 150, the owners of land along a public street had erected their houses at a point five feet back of the established house-line. Afterwards, one of them started to build a bay-window projecting beyond and into the five feet strip. An adjoining property owner attempted to enjoin him, but the court, Paxson, J., writing the opinion, held that: "The mere setting back of a building from the line of a street by the owner for his own convenience or comfort is not of itself a dedication of the land thrown out, and he may reclaim it at will: Biddle *v.* Ash, 2 Ashmead, 211; Gowen *v.* Philadelphia Exchange, 5 W. & S. 141. There would be even less reason to infer such dedication where, as here, the owner fenced in the land thrown out and used it as a garden or grass-plot."

This view will be found expressed in a large number of cases, so many, indeed, that to review them here would extend this opinion to inordinate length. It is enough to say that they uniformly rule against complainant's position.

5. Explanation of answers to requests.

Reference has already been made to the difficulties created by failure of counsel to follow Equity Rule No. 62. A further reference to it is necessary,

because it explains, in part at least, the answers to several requests for conclusions of law.

Take, for instance, the complainants' eighteenth request for conclusions of law. The principle of law there stated is undoubtedly correctly stated. It is supported by ample authority, notably McDevitt *v.* Gas Co., 160 Pa. 367. The same is true of the nineteenth request. It is supported by Martin *v.* Williamsport, 208 Pa. 590. Other requests are supported by authorities of the same grade. Yet the requests have been baldly denied. They have been denied because in all of the cases referred to the highway was found or conceded to be a public highway; that is, a highway existing by exercise of the right of eminent domain, dedication or prescription. In the case at bar the very existence of the highway was challenged. That challenge was the outstanding issue of fact and law. It follows that such authorities, and that requests founded upon them, cannot have the slightest bearing upon the adjudication.

The obvious conclusion is that litigants who load down their requests for conclusions of law, which as abstract questions of law are correct, but have no application to the pending issue, do not well serve their causes, and that, unconsciously, they introduce the factor of delay into the equation. It is not enough that a chancellor affirm or refuse his ruling; he must state the reasons for a refusal of it: Palmer Water Co. *v.* Lehighton Water Supply Co., 278 Pa. 298. This casts upon the chancellor a degree of labor which must be shared by the litigant: Roberts *v.* Beatty, 2 P. & W. 63. For this reason, the Supreme Court, by Equity Rule No. 62, has provided a method whereby chancellors may have the benefit of the criticism of both sides. This tends materially to lighten the labors of the chancellor and to discourage also the interjection of irrelevant and frivolous issues into a case. This rule is mandatory and must be enforced. Its tendency is to produce prompt decisions in equity trials to which litigants have every right.

6. Conclusion.

It follows from the foregoing that the borough is not entitled to an injunction. It does not follow, however, that it is totally without remedy. Unquestionably, its desire to preserve the appearance of its streets is commendable, and since, by the Act of May 14, 1915, ch. v, art. I, § 1, cl. 17, P. L. 312, it is invested with power, *inter alia*, "to make such other regulations as may be necessary for . . . the cleanliness and the beauty . . . of the borough," courts are bound to aid in the attainment of such objects. This aid will be granted when the power vested in the borough has been lawfully exercised. When it has lawfully appropriated the lands abutting on Main Street to the width contemplated by Ordinance No. 14 (and the long lapse of time between the passage thereof and this date seems not to be a bar to a present proceeding for the assessment of damages: Gay Street, 6 Pa. C. C. Reps. 187), or when it shall have exercised the power conferred by the Act of June 29, 1923, P. L. 949, to establish building-lines, the court will not withhold its aid. But until the borough has acquired a right cognizable in law or equity, the court cannot grant relief.

*Conclusions of law.*

1. The effect of Ordinance No. 14 was to widen Main Street to the width comprehended between the building-lines established on either side of the street and to notify abutting property owners of the intention of the Borough of Emaus to appropriate and condemn such lands under the power of eminent domain.

2. The Borough of Emaus did not acquire any rights in or to the lands between the edge of the pavement and the building-line as established by

Ordinance No. 14, because compensation for the land had not been assessed, paid or secured.

3. Ordinance No. 14 was not an exercise of the police power of the borough.

4. The Borough of Emaus did not possess in 1874 the power to establish building-lines, except as an incident to the opening or widening of streets in the exercise of the power of eminent domain.

5. There was no dedication of the land lying between the edge of the pavement and the building-line established by Ordinance No. 14 to the Borough of Emaus or to the public.

6. Complainants are not entitled to a perpetual injunction, and the preliminary injunction must be dissolved.

7. The prayer of the bill of complaint must be denied and the bill dismissed, at the cost of the complainants.

### Decree nisi.

And now, April 7, 1924, this cause came on to be heard at this term, and, upon consideration thereof, it is ordered, adjudged and decreed that the relief prayed for in the bill of complaint be denied and that the bill of complaint be dismissed, at the cost of the complainants.

The prothonotary will notify the parties or their counsel of the filing of the foregoing findings of fact and conclusions of law, and shall enter, also, this order as a decree nisi, giving notice thereof to the parties or their counsel, and if no exceptions are filed thereto within ten days, he shall enter the same as a final decree.

From Edwin L. Kohler. Allentown, Pa.