171 So.2d 873 (1965)
FLORIDA EAST COAST RAILWAY COMPANY, a Florida corporation, Appellant,
v.
MARTIN COUNTY, a Political Subdivision of the State of Florida, et al., Appellees.
No. 32970.
Supreme Court of Florida.
January 20, 1965.
Rehearing Denied March 15, 1965.
*874 John B. L'Engle, Jacksonville, and Sumner & Sumner, Ft. Pierce, for appellant.
Dean Tooker, Stuart, for appellees.
HOBSON, Justice (Ret.)
The appellee Martin County brought this condemnation suit against the Florida East Coast Railway Company and its mortgagees in the Circuit Court of the Ninth Judicial Circuit, in and for Martin County, Florida, for the purpose of acquiring a public easement fifty feet in width. Martin County proposed to locate a public county road over the railroad's tracks.
All of the matters in controversy between Martin County and the Florida East Coast Railway Co., et al., except for the amount of damages for the taking, were decided, without a jury, by the trial Judge Honorable C. Pfeiffer Trowbridge in favor of Martin County and against Florida East Coast Railway Co., et al. Trial by jury was had upon the issue of damages to the Florida East Coast Railway Co., et al.
Appellant being aggrieved by several of the rulings of the trial judge as well as the entry of the final judgment instituted an appeal to the District Court of Appeal, Second District, which Court, after determining that jurisdiction of this case on appeal was in the Supreme Court of Florida, entered an order transferring the cause to this Court.
Counsel for appellant contend that there are nine points involved on this appeal. They state and argue them in the sequence of time at which they arose. We will now attempt to state these nine points and thereafter discuss those points which we deem worthy of serious consideration.
Point No. 1 raises the question whether it was error for the trial court to deny the Railway's motion to dismiss directed to the petition and its exhibits. It is said that the petition and exhibits failed to show that the easement sought to be taken was for a lawful public purpose.
Point No. 2 is a challenge to the order of the trial judge denying the motion to strike filed by the Florida East Coast Railway Co., which order bears date October 10, 1962. The motion to strike was directed to five WHEREAS paragraphs of the resolution of the Board of County Commissioners which was annexed to and made a part of the petition filed by Martin County. It is urged that the matters contained in the five WHEREAS paragraphs are irrelevant and immaterial.
Point No. 3 assails the order of the trial court entered November 30th, 1962, granting Martin County's motion to strike designated parts of the Railway's answer. The portions of the answer which were stricken were allegations of special damages: "(a) the cost of grading and paving, and annual cost of maintenance of the grade crossing, and (b) cost of installation of automatic crossing protection devices  flashing lights, bells, and gates, and maintenance of same, *875 all alleged to be reasonably necessary to reduce the great hazards and dangers to persons and property using the proposed grade crossing * * *".
Point No. 4 is directed to the order on petition and answer entered by the trial court on February 20, 1963. The effect of this order was that Martin County had established its right to proceed with the condemnation of the easement sought, notwithstanding the Railway's contention that Martin County was without power to acquire the easement because of the hazards to life, limb and property that would be presented by a grade crossing at the site prayed at M.P. 260 plus 122 feet, and material interference with interstate commerce.
Point No. 5 raises the query whether the trial judge erred when he overruled objections to certain photographs and testimony depicting safety conditions at established public road grade crossings distant from site of the proposed public road grade crossing.
Point No. 6 poses the question whether the trial court erred in overruling a challenge for cause requested by counsel for the Railway Company directed toward a juror who admitted that he had seen and heard as a spectator the "last hour" of the trial before the court without a jury.
Point No. 7 directs our attention to the refusal of the trial judge to include in the Judgment for Costs the full amount of $3,355.54, which was testified to as being a fair and reasonable fee for the services of the civil engineer who qualified as an expert witness and testified for the Railway Company in support of certain affirmative defenses but he did not testify with reference to the value of the easement sought to be taken. The trial judge allowed this expert witness $1,438.25, instead of $3,355.54. Appellant contends that the latter and higher amount should have been allowed. On the other hand by a cross-assignment of error the appellee, Martin County, insists that the trial judge erred in allowing any fee for this witness.
Point No. 8 is an assault by appellant Railway Company upon the trial court's failure to tax as costs the sum of $192.25, which sum was paid by the Railway Company to the court reporter for a carbon copy of the Transcript of Testimony and copy of a deposition admitted in evidence.
Point No. 9 presents a question which is of great interest to most, if not all, practicing attorneys. The question is one of reasonable attorney fees. Two qualified attorneys testified respectively to $10,000.00 and $9,000.00 as reasonable attorney fees to be allowed the Railway Company for the services of its attorneys in this case. There was no other testimony upon this subject and the trial judge allowed the sum of $6,000.00 as attorney fees. Counsel for the Railway Company say the allowance should not have been less, under the facts and circumstances, than $9,000.00, while counsel for Martin County insist that the fee allowed by the trial court of $6,000.00 should, by this Court, be substantially reduced.
We turn now to a discussion of these nine points which have been presented by appellant for our consideration.
Points 1 and 2 will be treated together. We have examined the petition and have determined that it is not fatally defective and that the motion to dismiss said petition was properly denied. The petition complies with the requirements of Section 73.01, Florida Statutes, F.S.A. Counsel for appellant have apparently confused necessary allegations with ultimate essential proof. It is true, as contended by appellant, that property condemned for a public road or easement must be a connecting link between public roads or properties. They have cited many of our decisions to this effect. The statute, however, does not require the petition to allege on this point anything more than the following: "The authority under which, and the public use to which the property is to be acquired, *876 and that the property is necessary for that use;". The appellant had the right to challenge the allegation of a valid public purpose as a matter of fact and the record discloses that it did just that. After a trial before the court without a jury on this issue, appellant was unsuccessful.
Appellant contends that the description of the property or easement sought to be condemned was insufficient, but we find that said description complies with Section 73.01 (2), Florida Statutes, F.S.A., in that it is sufficient for the identification by appellant or any other interested person of the easement sought to be acquired.
With reference to the "WHEREAS" clauses, suffice it to say that although they may not have been absolutely essential they are not wholly irrelevant and immaterial because they are a part of the public records kept by the Board of County Commissioners to serve to inform the public of the Board's actions and the reasons for its actions. Moreover, it appears to us that it is entirely proper for the Court, as well as the condemnee, to be advised of the findings which motivated the Board of County Commissioners.
We find no merit in appellant's contention that because the survey map (petitioner's Exhibit 6) includes both Alice Avenue West and the easement to be condemned, this exhibit proves that Alice Avenue West in fact is not public.
In his order of November 30th, 1962, the trial judge stated that the question which is the subject matter of appellant's Point No. 3 "appears to be one of first impression in the State of Florida." We agree with this observation.
The order entered by the presiding judge is quite lengthy. We will not quote it in full but will attempt to summarize the reasons for his conclusion and determination that the motion to strike should be granted.
In his order, the judge recognized the fact that the decisions in other jurisdictions are not uniform. He found, however, the majority rule to be against appellant's contention.
The decision upon which he strongly relied is the one by the Supreme Court of the United States in Chicago, Burlington & Quincy Railroad Company v. Chicago, 166 U.S. 226, at page 255, 17 S.Ct. 581, at page 592, 41 L.Ed. 979. The United States Supreme Court in its opinion stated:
"The expenses that will be incurred by the railroad company in erecting gates, planking the crossing, and maintaining flagmen, in order that its road may be safely operated,  if all that should be required,  necessarily result from the maintenance of a public highway under legislative sanction, and must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the state. Such expenses must be regarded as incidental to the exercise of the police powers of the state. What was obtained, and all that was obtained, by the condemnation proceedings for the public was the right to open a street across land within the crossing that was used, and was always likely to be used, for railroad tracks. While the city was bound to make compensation for that which was actually taken, it cannot be required to compensate the defendant for obeying lawful regulations enacted for the safety of the lives and property of the people."
Appellant argues somewhat forcefully that the decision in the Chicago, Burlington & Quincy Railroad case, which was rendered in the year 1897, should not be applied in this era of modernity; that there were few motor vehicles in existence prior to the turn of the century and offered statistics to show the tremendous volume of vehicular traffic in this nation and particularly in the State of Florida at *877 the time of the trial. Moreover, counsel for appellant insist that the Supreme Court of Florida has been liberal in its construction of our constitutional provisions as well as our statutory law which provide for "full" and "just" compensation to the owner of land which is taken in any eminent domain proceeding.
We realize that this Court has demonstrated a tendency toward liberality in construing the words "just" and "full" compensation. Consequently, we are impelled to say to counsel for appellant that which was stated by King Agrippa to the Apostle Paul, Acts 26:28, "Almost Thou persuadest [us] * * *."
In Dade County v. Brigham, (Fla.) 47 So.2d 602, 18 A.L.R.2d 1221, we approved the inclusion in the judgment of the reasonable fees paid by the condemnee to expert witnesses who testified to the value of the land sought to be taken. We were of the view, and still are, that a property owner whose land is taken from him upon the theory of a genuine public need therefor does not receive "just" or "full" compensation if he is required to pay such expert witnesses from the monies received for the value of his land and that upon the issue with reference to the value of the land sought to be taken he should be accorded the right to meet the condemning authority upon an equal footing without loss to himself.
Again, in Jacksonville Expressway Authority v. Henry DuPree Co., (Fla.) 108 So.2d 289, 699 A.L.R.2d 1445, we allowed the moving costs occasioned the condemnee by virtue of the eminent domain proceeding. In that case we said:
"We feel our constitutional provision for full compensation requires that the courts determine the value of the property by taking into account all facts and circumstances which bear a reasonable relationship to the loss occasioned the owner by virtue of the taking of his property under the right of eminent domain." (Italics supplied.)
In Brigham, we adopted as our own the language of the Circuit Judge who wrote:
"Full compensation is guaranteed by the Constitution to those whose property is divested from them by eminent domain. The theory and purpose of that guaranty is that the owner shall be made whole so far as possible and practicable."
We do not recede from Brigham or DuPree, but we do feel that in those cases we probably went the last mile, so to speak.
We are of the opinion, as was the learned circuit judge, that the reasoning of the United States Supreme Court in Chicago, Burlington & Quincy Railroad Co. v. Chicago, supra, is as sound and logical today as it was when it was written. It is true now as then that: "The expenses that will be incurred by the railroad company in erecting gates, planking the crossing, and maintaining flagmen, in order that its road may be safely operated,  if all that should be required,  necessarily result from the maintenance of a public highway under legislative sanction, and must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the state. Such expenses must be regarded as incidental to the exercise of the police powers of the state." We think that the expenses which the railroad might be put to in grading and paving and maintaining the crossing and the costs of installation of automatic crossing protection devices is a matter which the company should have taken "into account when it accepted the privileges and franchises granted by the state," and that such expenses are the result of the exercise of the police powers of the state and do not, under all the facts and circumstances, "bear a reasonable relationship to the loss occasioned the owner by virtue of the taking of [its] property under the right of eminent domain."
*878 The able circuit judge said:
"This Court is of the opinion that the Constitution of the State of Florida requires only that the railroad be compensated for the easement taken and that any additional expense of the railroad in the grade crossing or in providing automatic protection devices is a cost of railroading and not a loss due to the taking."
We agree.
Everyone knows, as appellant contends, that there is more vehicular traffic of various types today than there was Circa 1897; that there are more people in this State than there were at the end of the Nineteenth Century, and that there has been a tremendous upswing generally in Florida's economy. It appears logical and reasonable to assume that there has also been a great increase in the revenue of the appellant Railway. Forgetting this assumption, the facts above stated do not justify or support appellant's argument that the decision of the United States Supreme Court in Chicago, Burlington & Quincy Railroad Co. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, is outmoded and should not be applied under present day conditions. This is so because the theory underlying the subject decision of the United States Supreme Court, which theory was adopted by the trial judge in this case and approved herein by this Court, is that these alleged special damages are expenses which "must be regarded as incidental to the exercise of the police powers of the state" and do not amount to "a loss due to the taking."
In connection with Appellant's Point No. 4, we have decided to quote from and adopt as our own the major portion of the Order entered by the trial judge which demonstrates that he gave a great deal of study and careful consideration to this point. We quote from said Order as follows:
"The Petitioner, Martin County, brought this condemnation suit against the Defendant railroad, F.E.C. Ry. and its mortgagees, to acquire a public easement fifty feet in width to locate a public county road over the railroad's tracks. The railroad (and its mortgagees for whom its counsel also appeared) filed a lengthy Answer to the Petition which in substance raised three defenses to the suit which were litigated at the trial: (1) bad faith and gross abuse of discretion by the Board of County Commissioners in adopting the resolution establishing the crossing and authorizing the suit to acquire it; (2) no public county road was established abutting the crossing on both sides; and (3) such an easement will be an undue and unlawful burden upon intra- and interstate commerce by common carrier railroad.
In its brief following trial the railroad argued only the first defense and from statements made at the argument may have abandoned the second defense. Notwithstanding this ambiguity, however, the Court is of the opinion that the county affirmatively proved its establishment of a public county road abutting the proposed easement on both sides and the railroad neither met the county's proof nor proved otherwise. Further, as to the third defense the Court is of the opinion that the evidence fails to show any undue or unlawful burden upon intra- or interstate commerce by the establishment of the proposed crossing. These second and third defenses will not be discussed further.
Although nothing in the Petition indicates that the easement sought is to establish the crossing at grade level, both parties have litigated the matter upon the assumption that the crossing would be at grade and the Court will so consider it in view of this assumption and of the railroad's repeated statement to the Court that it would have no objection to the county road going overhead.

*879 The real meat of this case, which has required more than one year and over six hundred pages of testimony to resolve, is the basic question of whether the Martin County Board of Commissioners acted in bad faith or with gross abuse of discretion in resolving to establish this crossing. At the opening of the trial the railroad conceded that the burden of proof upon these matters rested upon it and it is with such duty in mind that the Court will consider the case.
At the outset it is best to make clear what the Court cannot do. It cannot determine whether the crossing should be established. That is a power of the Board of County Commissioners acting in good faith and without gross abuse of discretion. The Court cannot determine whether such a crossing will be dangerous. A circuit court has no authority to prohibit dangerous railroad crossings per se. How this Judge would have voted had he been a member of the Board of County Commissioners is not controlling because the decision to be made by that body is not the same as the decision to be made by this Court.
The question which this Court must determine is whether the Board of County Commissioners acted in bad faith or with gross abuse of discretion. In reaching this decision the Court may consider whether the crossing is dangerous, along with all of the other factors that go into the county's decision, but the Court may not substitute its judgment for that of the Commissioners.
The Court will consider separately the two major contentions of bad faith and gross abuse of discretion:
I. BAD FAITH
At the trial, the Chairman of the Board of County Commissioners of Martin County appeared and testified with regard to the actions of the County Commissioners prior to adopting the resolution establishing the grade crossing and with regard to the reasoning of the Board of County Commissioners in so acting. Upon cross examination, the railroad brought out that the Chairman, Mr. Frank Wacha, is in private life a certified public accountant who has as one of his clients Radio Station WSTU. While the corporation owning this radio station is not a party to this cause, it is no secret that the crossing will be of great benefit to the radio station and that the closing of the former private crossing at this location caused considerable detriment to the radio station. When Mr. Wacha was questioned regarding the ownership of property by the radio station in the area of the crossing, he asserted the privilege granted by statute to certified public accountants not to disclose the business of a client without the written consent of that client.
The railroad makes much to do about this assertion of privilege and draws numerous inferences from it including the inference that Mr. Wacha may have a property interest in the radio station or may have acted improperly as a County Commissioner to benefit this radio station. However, the railroad had ample opportunity to produce records of the Office of the Secretary of State of Florida concerning the corporation owning the radio station, to depose the officers of the radio station, and to subpoena the corporate books including the stock books of the station. In addition, the president and general manager of the radio station actually appeared upon the witness stand and was subjected to cross examination by the railroad. No questions along these lines were asked of this witness. In fact, the railroad did not even ask Mr. Wacha whether he owned an interest in the radio station, which question certainly would not *880 have been a matter of privilege. With regard to the inference that Mr. Wacha may have acted improperly as a County Commissioner, there is no evidence whatsoever to rebut the presumption that an elected official conducted his office in a proper manner. In any event, Mr. Wacha was only one of five county commissioners and there is no showing that his vote was determinative of the action taken by the board. Accordingly, this Court finds that no evidence has been presented to show that Mr. Wacha personally acted improperly in this matter.
While upon the witness stand, the Chairman of the Board of County Commissioners testified that the Board's action was taken because an investigation by them discloses that this particular area was developing rapidly, that it was a desirable area for development, that expensive homes had been constructed and future plans called for more construction in the area, that a through road connecting the established portion of Alice Avenue to the site of the former private crossing at the radio station was a part of the long range planning of the county, that the radio station performed a fine public service for Martin County and that it was important that access be provided to the station so that this service could be rendered, that the former private crossing had been in existence for many years without any indication that it was a private crossing, and that the County owned public road-right-of-way on both sides of the crossing. With regard to the matter of safety, the commissioners compared the proposed crossing with other crossings in the county which they considered more dangerous; the commissioners actually examined the proposed crossing and put their cars on both sides of it to examine the sight distance; they considered the history of safety at the former private crossing; they determined that a crossing was needed for the purpose of getting fire fighting equipment into the area rapidly (particularly in view of a history of fires in this area along the railroad track) and, in general, the crossing was believed by the board to be for the betterment and for the future growth of Martin County. These views of the Chairman were corroborated by the certified copies of the minutes of two county commission meetings admitted in evidence as Petitioner's Exhibits 4 & 5.
Mr. Wacha testified further that the Board of County Commissioners consulted with their County Engineer, a Mr. A.V. Shelton, who had formerly been a long time employee of the State Road Department in charge of specifications and plans and of the training course for that department. Unfortunately, this engineer died several months prior to the trial of this case and so his testimony was unavailable. The board relied upon this professional engineer for advice in the engineering problems concerning the crossing.
As further evidence of their good faith in enacting the resolution establishing the proposed crossing, the Board of County Commissioners, prior to the enactment of that resolution, granted a special hearing and meeting at which the railroad appeared and presented its views. The Senior General Attorney for the railroad, Mr. John B. L'Engle, one of the attorneys who conducted the trial of this case for the railroad, appeared at this hearing before the Board of County Commissioners on behalf of the railroad.
From the foregoing, the Court concludes that the railroad did not meet the burden of proof to establish that the action of the Board of County Commissioners was in bad faith. In this regard, it should be noted that the Court admitted most of the testimony *881 upon this issue, and the exhibits pertaining to the issue, for the sole purpose of determining whether the Board of County Commissioners acted in bad faith or in gross abuse of discretion and not for the purpose of proving the truth of the county's arguments concerning the safety of the proposed crossing. The Court recognizes that most of this evidence would be inadmissable to prove the question of safety. However, the fact that the Board of County Commissioners did personally investigate the matter, did consult with a professional engineer, did conduct a special meeting for the purpose of hearing the railroad's views, and did state such reasons for their action in adopting the resolution establishing the proposed crossing, is admissable evidence upon the issues of bad faith and gross abuse of discretion.
II. GROSS ABUSE OF DISCRETION
Basic to the resolution of this issue is a recognition that two opposing philosophies are involved in this matter. The railroad is naturally and understandably concerned primarily with the economical and safe operation of the railroad. The elected commissioners of Martin County are naturally and understandably primarily concerned with the development of the area, the convenience of the public, and the safety of the crossing. Every grade crossing is a detriment to the railroad's aims. Every foot of railroad track which blocks movement, like a wall, is a detriment to the public convenience. The four rails of the main line of the railroad extending over 400 miles from north to south in this State are a barricade to the movement of the public except at those locations where roads go under, over, or cross at grade level. The fewer the grade crossings, the better the operation of the railroad. The more the crossings, the greater the convenience of the public. While viaducts and tunnels solve the problem in theory, their cost is so great that they cannot solve the problem in practice. No matter how desirable it might be, from an economical standpoint all grade crossings cannot presently be eliminated. Each philosophy is understandable and reasonable. Each philosophy is interested in safety. Unfortunately opinions differ as to the safety of the proposed crossing.
It is with regret that the Court observes that this case was not litigated in an atmosphere of good will. The railroad seeing this as a test case ultimately determining a precedent which will result in savings or expense many times the value of the easement being sought, has thrown the full weight of its organization into the controversy. The Board of County Commissioners, feeling that the authority of a county of this State has been slighted, has responded with an equal determination to see their official decision carried out. With all due respect to the honor and integrity of the men involved, a personality clash is evident between one of the principals on each side of the controversy.
In this situation, if the Court were sitting in judgment of the grade crossing problem for the entire length of the railroad, through the process of bargain and compromise each side probably could be persuaded to give a little and an equitable result could be obtained. However, that is not the case here as only one grade crossing is at issue and this Court must decide the fate of that single crossing.
The evidence discloses beyond a doubt that to railroad men all grade crossings are dangerous. Each witness presented by the railroad conceded this point either flatly or in principle. However, since it is obvious in this stage of history that all grade *882 crossings cannot be eliminated, the inherent danger of grade crossings per se cannot be determinative of the issue here.
The railroad presented much expert testimony upon sight distances with relation to time, that is the length or time a motorist at the crossing would have from the time he first saw a train approaching to decide whether to cross and to complete the crossing if begun. The railroad's expert witness demonstrated that under existing speed limitations the sight distance time is dangerously inadequate. In fact, the words `critical dangerous crossing' were frequently used. Opposed to this, however, is evidence that the former private crossing was in use for many years without the occurrence of a single accident to the knowledge of the witnesses familiar with the area. The railroad, which might be expected to have best knowledge of this matter, presented no evidence of any such accident.
In addition, it is readily conceded that as the speed of the train is reduced, the time available for decision and crossing is increased. If this proposed crossing were located in the middle of a lengthy stretch of straight track with no speed limitations in the vicinity, the requirement that trains slow down for the crossing only to speed up again would be more onerous than in the instant case. However, within approximately 4,000 feet from the proposed crossing is a switch to a single track for the St. Lucie River bridge. The railroad's own speed limit across this single track is 20 miles per hour. In response to a question from the Court the railroad's witness, Robert F. Stack, who is railroad Foreman of Engines and Trainmaster and who actually pulled the throttle on freight and passenger trains in this area for over seven years, stated that the maximum loss of time from reducing the speed of trains to 30 miles per hour at the proposed crossing would be two minutes. This maximum would be applicable only to south bound trains as north bound trains would be limited by the length of the train in that the 20 mile per hour existing speed limit at the single track switch would be applicable until the last car had cleared the switch and with the longer trains the engine might already be at the proposed crossing before this occurred.
Whether the reduction of train speed or the increase if sight distance at a crossing affects safety appears to be disputable. The railroad has presented statistics upon the subject but at the same time its own experts have stated that one cannot rate a particular crossing. It has been argued that on the one hand a motorist at a blind crossing will disregard signal devices as he cannot see the train approaching, while on the other hand it has been argued that a motorist at a crossing with visibility sufficient to see a train far off in the distance will disregard such signal devices because of his own judgment that he can beat the train to the crossing. Statistics produced by the railroad show that the use of automatic protection devices does not eliminate the accident problem at grade crossings. However, the railroad's witnesses also testified that these automatic devices could be set so as to give the 30 second warning advocated by its own experts upon sight distance time. Other evidence of the railroad discloses that motorists over the 26 month period preceding the trial broke an average of 14 gates per month by driving into them, and over the latter nine months of this period the average was 16 per month showing an increase in this activity. While this demonstrates that even automatic gates do not prevent grade crossing accidents it also appears to the Court that a crossing *883 cannot be denied in order to protect a motorist from his own folly in crashing through such gates.
All of this discloses that there is no clear conclusion regarding the safety or danger of the proposed crossing. Fortunately the Court is not required to decide this point but must only decide whether the railroad has carried the burden of proof of showing that the Board of County Commissioners acted with gross abuse of discretion in resolving to establish a public grade crossing at this point. The legislature has given the decision regarding the establishment of such crossing to the elected representatives of the people and not to the officers of the railroad. In this case these representatives of the public have determined that it is in the best interest of the public for this crossing to be established and in view of the evidence presented to this Court there was no gross abuse of discretion in reaching this determination. In deciding that in this particular case the public convenience must prevail over the railroad operation, the Board of Commissioners has, in their proper discretion, determined that the march of progress in Martin County cannot be slowed to that pace exhibited by railroads over the last 50 years."
We find upon careful consideration of the briefs and after having heard arguments of counsel that there is no merit to appellant's Point No. 5, nor to appellant's Point No. 6.
As we have previously noted, this Court in Dade County v. Brigham, (Fla.) 47 So.2d 602, approved the allowance in the judgment in an eminent domain proceeding of reasonable fees paid by the condemnee to expert witnesses who testified to the value of the land to be taken. Under Point No. 7, we are faced with an entirely different question in this case. Melvin A. Connor did not testify as an expert witness with reference to the value of the easement sought to be taken, but only in connection with the affirmative defenses of the appellant.
We hold the view that the fees of witnesses who testify in support of affirmative defenses as did Mr. Connor should be assessed as costs exactly as costs are assessed in all other civil actions and should not be included in the judgment entered pursuant to the verdict of the jury.
We do not find, as suggested by Point No. 8, any error in the refusal of the trial judge to tax as part of the costs the charges for copies of the transcripts of testimony and for a copy of the deposition used by Appellant Railway.
With reference to the allowance of $6,000.00 attorney fees for appellant's attorneys, we do not discern an abuse of sound judicial discretion. As is contended by appellant in Point No. 9, it is true that the only testimony with reference to reasonable attorney fees was in one instance $9,000.00, and in another $10,000.00. Although testimony with reference to reasonable attorney fees may and in most cases should be heard and considered it is not binding upon the court particularly in a case wherein the judge who fixes the fees presided throughout the entire proceeding in the nisi prius court. He is usually in a better position than are the lawyers who testify as expert witnesses to know the amount of work necessarily done and the complexities of the legal problems involved. We find no reason to disturb the somewhat liberal allowance of $6,000.00 as and for attorney fees. Indeed, had it not been for the affirmative defenses unsuccessfully urged by the appellant this suit would have been an ordinary and usual every day eminent domain proceeding. It must be remembered, however, that the appellant had the right to challenge the assertion of a public need for the easement sought to be condemned and also the right to set up affirmative defenses. No court has declared such defenses *884 to be frivolous, although the Circuit Court and this Court found them to be devoid of merit.
The judgment from which this appeal was prosecuted is affirmed except the portion thereof which allowed expert witness fees to those witnesses who testified only in support of appellant's affirmative defenses and who did not testify with reference to the value of the easement sought to be taken.
Affirmed in part and reversed in part.
DREW, C.J., and ROBERTS, THORNAL, O'CONNELL and ERVIN, JJ., concur.
THOMAS, J., dissents because the Court is without jurisdiction.