455 So.2d 301 (1984)
The DEPARTMENT OF TRANSPORTATION OF the STATE OF FLORIDA, Petitioner,
v.
Robert M. NALVEN and Lionel I. Nalven, Respondents.
Nos. 61795, 61811.
Supreme Court of Florida.
April 19, 1984.
Rehearing Denied September 26, 1984.
*302 Alan E. DeSerio, Appellate Atty., Oval Boone, Trial Atty., and John H. Beck, Gen. Counsel, Tallahassee, for petitioner.
Lawrence J. Robinson of Robinson & Robinson, P.A., Sarasota, for respondents.
BOYD, Justice.
This cause is before the Court on petition for review of a decision of a district court of appeal reported as Nalven v. Division of Administration, 409 So.2d 166 (Fla. 2d DCA 1982). The district court of appeal certified that its decision passed upon a question of great public importance. The Department of Transportation petitioned for discretionary review of the decision both on the jurisdictional ground of the certified question and on the ground of direct and express conflict of decisions. We accept jurisdiction based on the certified question. Art. V, § 3(b)(4), Fla. Const.
In essence this case presents a question of the admissibility of testimony ostensibly based upon expert opinion. But the evidentiary question turns on the resolution of questions arising from the use of market value as the basic indicator of "full compensation" for property taken by eminent domain as required by the Florida Constitution. Rejecting the Department of Transportation's argument that the state should not have to compensate for value attributable to anticipation of the project for which the property is being taken, the district court held that a landowner is entitled to receive the fair market value of the property at the time of the taking. For the reasons that follow we approve the decision of the district court.
On February 14, 1977, the Department of Transportation initiated proceedings for condemnation of several parcels of land needed for the construction of a portion of Interstate Highway 75 in Manatee County. Among the defendant landowners were the respondents Robert and Lionel Nalven, who owned a tract of approximately one thousand acres, of which 91.5 acres were condemned for the highway right-of-way. By the time the case went to trial, the only remaining matter of dispute between respondents and the state was the valuation of, and compensation to be paid for, the 91.5 acres to be taken by the state.
At trial each side presented the testimony of an appraisal expert. Both experts testified that the best way to determine the market value of unimproved land is to gather and examine information on the sales prices of similar land in the same area. They testified further that the similarities and differences in various characteristics of the parcels studied should then be analyzed in order to find the recent land sales that are most "comparable." The characteristics studied are those which relate most directly to market value, such as size, location, topography, road access, drainage, waterfront access, and proximity to beneficial or obnoxious facilities or projects. These "comparable sales" are then expected to reveal market values that can be used to approximate the market value of the land being appraised.
The landowners' expert testified that of the fourteen sales in Manatee and Sarasota Counties that he considered, three related to parcels that were most comparable to the land being taken. The three comparable sales considered by the landowners' expert were: (1) a 1973 sale of the parcel to be appraised (i.e., the owners' thousand-acre tract of which the 91.5 acres being condemned were a part), which yielded $2,100 per acre; (2) a 1973 sale of a nearby parcel referred to as Creekwood, which sold for $2,365 per acre; and (3) a later sale of a parcel in Sarasota County, referred to as The Meadows, for $3,500 per acre. The expert testified that after making further adjustments based on the passage of time and refinements based on remaining differences, he concluded that as of the date of his testimony the land being taken for the highway had a market value of $2,350 per acre resulting in an appraisal of $215,110.
The Department of Transportation's expert testified that although the prior sale *303 of respondents' property and the sale of Creekwood were among the recent sales of comparable properties in the area, he excluded them from his analysis because the sales prices of the parcels reflected an increase in market value resulting from the expectation of the proposed highway project. He expressed the opinion, that is, that in 1973 the two parcels sold for more than they would have in the absence of any anticipation of the construction of the interstate highway. The Department's expert appraised the land at $1,440 per acre, thus giving it a total value of $131,825. The landowners' counsel moved to strike this testimony but the trial judge allowed it to stand. The jury returned a verdict fixing the compensation at $133,525, which reflected acceptance of the state expert's valuation plus an allowance for fencing replacement costs. The landowners appealed.
The sales discarded from consideration by the state's appraiser occurred in 1973. The record shows that on November 7, 1974, the Department of Transportation adopted a resolution indicating the general location proposed for Interstate 75. On February 1, 1977, the Department adopted a resolution specifying the route and identifying the particular tracts of land needed for the construction of the highway. The instant condemnation action was begun shortly thereafter. The Department argues that the sales in question were properly disregarded even though they occurred before the official acts identifying either generally or specifically the location of the highway. The Department argues that even before November 7, 1974, there was general knowledge in the marketplace concerning the location; it was openly discussed in public meetings and in documents open to public inspection. There was testimony that the 1973 sales were negotiated in light of common awareness of the proposed general location of the highway.
On appeal the district court held that the trial court had erred in refusing to strike the testimony of the Department's expert that the two excluded sales were inappropriate to consider and his appraisal testimony based thereon. The district court explained that "any pertinent sale of land comparable to the condemned land which occurs before the date of the taking can be considered in determining value even if the sales price is enhanced by virtue of the proposed improvement." 409 So.2d at 169. Thus the district court concluded, and correctly so, that the state's expert went beyond his appraisal expertise and expressed to the jury an erroneous legal conclusion. The district court also concluded that since the state expert obviously influenced the jury with his erroneous theory, the judgment would be reversed for a new trial.
In reaching its decision the district court relied upon the long-standing precedent of Sunday v. Louisville & Nashville Railroad, 62 Fla. 395, 57 So. 351 (1912). There the Supreme Court of Florida reversed a condemnation award and remanded for a new trial on compensation because the trial judge had instructed the jury not to consider any enhancement in the value of the property taken caused by the proposed improvement. This Court explained that
the law does not deny to the owner any real and reasonable enhancement in the market value of the property to be appropriated by reason of "any improvement proposed." If the property naturally, or in common with other property similarly conditioned, increases in market value in anticipation of the proposed improvement, before the appropriation, the compensation therefor is the fair actual market value at the time of the lawful appropriation.
62 Fla. at 397, 57 So. at 351 (emphasis in original). The error in Sunday was in an instruction to the jury. But the district court correctly recognized that the principle of full compensation at the time of taking also applies to render inadmissible any expert opinion testimony based on an erroneous theory of valuation. Anderson v. State Road Department, 204 So.2d 899 (Fla. 1st DCA 1967).
Although correct in its application of the law, the district court went on to *304 suggest several reasons why this Court might wish to depart from the rule expressed in Sunday v. Louisville & Nashville Railroad. After setting out its concerns the district court certified its decision as having passed upon a question of great public importance. The district court framed the certified question as follows:
To what extent, if any, is a Florida property owner in a condemnation proceeding entitled to the enhancement in the value of his property caused by the anticipation of the proposed project for which the land is being condemned?
409 So.2d at 171. We answer the question by holding that a landowner in a condemnation proceeding is entitled to the fair market value of the property at the time of the taking even if it reflects the anticipation of the proposed project.
The Department of Transportation argues that its expert's testimony was properly allowed. The Department urges that a landowner whose property is taken should be compensated on the basis of the value of the property prior to any enhancement in value caused by the anticipation of the project for which the land is being taken. The Department asks us to adopt a rule of law in effect freezing the value of the land to be taken as of the time when the state becomes committed to placing the public project in a certain area, or, expressed another way, the time when the scope of the project becomes known in the market. The "scope-of-the-project" rule, the Department says, would exclude project influence from the appraisal of value and from the determination of just compensation, thereby protecting the public from having to pay a premium for needed lands and preventing landowners from reaping windfall profits simply because the state has an absolute need for certain land. The Department cites United States v. 320.0 Acres of Land, 605 F.2d 762 (5th Cir.1979), and numerous decisions from other states in support of the wisdom of such a rule.
Attempting to clear the way for us to adopt the so-called "scope-of-the-project" rule, the Department argues that Sunday v. Louisville & Nashville Railroad is inapplicable to the problem before us because: (1) it was based on a provision of the 1885 constitution which applied only to exercises of the power of eminent domain by private individuals and corporations and (2) the provision of the 1885 constitution upon which the decision was based has been eliminated and has no counterpart in the present Florida constitution or in the statutes. Finally the Department argues that if the Sunday rule is still the law of Florida and is applicable to the facts of this case then it should be abrogated in favor of the "scope-of-the-project" rule. We shall discuss the Department's constitutional and historical arguments first and shall then deal with its public policy arguments for a change in the law.
Article XVI, section 29 of the Florida Constitution of 1885 governed the appropriation of private property and rights of way to the use of corporations and individuals by eminent domain. It pertained to any legislatively authorized condemnation for purposes such as railroads, utilities easements, ways of necessity, drainage, and the like. It provided in part that the compensation for such takings should be ascertained "irrespective of any benefit from any improvement proposed by such corporation or individual."[1] The Department asserts that the holding in Sunday was grounded squarely on the constitutional language and argues that since both article XVI, section 29 and the Sunday case pertained to condemnation by private corporations Sunday has no applicability to the instant *305 case. This argument is erroneous. Petitioner is correct in pointing out that article XVI, section 29 applied only to private condemnations. Daniels v. State Road Department, 170 So.2d 846 (Fla. 1964).[2] The Sunday decision, however, provided in essence a construction of the constitutional words, "full compensation," and mentioned the constitutional words, "irrespective of any benefit," etc., only to refute any suggestion that they limited or qualified the meaning of "full compensation." Since article X, section 6, of our present constitution requires full compensation in all exercises of the eminent domain power, both public and on behalf of individuals or corporations, Sunday is still controlling authority and now applies even where the condemning authority is a state agency.[3]
The Department also argues that since the language "irrespective of any benefit from any improvement proposed by such corporation or individual," was eliminated by the constitutional revision of 1968, Sunday is no longer the law of Florida. Like the assertions just discussed, this argument also assumes that the Sunday decision was compelled by the constitutional language. A careful reading of the Sunday opinion, however, reveals that the decision was rendered not because of but in spite of the quoted language.[4] Far from being grounded in the constitutional language, "irrespective of any benefit," the Sunday decision held the language inapplicable to the facts of the case, that is, inapplicable to enhancement in market value of the land taken due to anticipation of the project. The Court mentioned the constitutional language in order to explain why it did not compel the conclusion sought by the appellee, the condemnor. The "benefit" referred to in article XVI, section 29 meant not enhancement in the value of the land taken, but rather any increase in the value of land not taken, as, for example, by reason of its being adjacent to a railroad or other improvement. The quoted clause was meant to negate any intention of allowing a private condemnor to offset the value of benefits to the remainder of the condemnee's land against the compensation paid for the property taken. See Daniels v. State Road Department, 170 So.2d 846 (Fla. 1964); § 73.071(4), Florida Statutes (1981).[5] Therefore, the clause, "irrespective *306 of any benefit," etc., was not the basis for the Sunday decision. Sunday applied the concept of "full compensation" applicable to takings by individuals and corporations under the 1885 constitution. Under article X, section 6 of the Florida Constitution of today, "full compensation" is to be paid for all property taken by condemnation, whether by a state agency or an authorized private person. Therefore, the absence of language in article X, section 6 corresponding to "irrespective of any benefit from any improvement," does not in any way indicate that the rule of Sunday has been abrogated. As the district court correctly recognized, Sunday continues to be the law of Florida and fully applies to this case.
We come now to the Department's plea for a change in the law. As was stated above the Department urges upon us the "scope-of-the-project" rule. Such rule, as interpreted by the state, would admit the expert's testimony that the questioned sales were to be discarded from consideration on the ground that they were negotiated at a time when the general location of the interstate highway through Manatee County was known in the real estate marketplace.
The "scope-of-the-project" rule was first announced in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). There the government took various lands by damming a river and flooding a valley, creating a large lake. On the shore of the lake there grew a small settlement, drawn there by the amenities offered by the lake. Among those dispossessed by the flooding project was a railroad, whose right-of-way therefore had to be relocated. When the government sought to condemn a part of the newly settled area for railroad purposes, the owners claimed the right to be compensated for the value of their lands as part of a desirable lakeside community, while the government sought to value it as what it was before the creation of the lake, uncleared brush lands. Finding that relocation of the railroad had been part of the project from its inception and that it was public knowledge that the route of it would probably be through the condemnees' lands, the Court held they were not entitled to receive the market value of their land as enhanced by river dam project. In so holding the Court fashioned the "scope-of-the-project" rule. Thus the rule developed in what many commentators call a "supplementary taking" or "expanded project" situation. See, e.g., 4 J. Sackman, Nichols' Law of Eminent Domain § 12.3151[3] (rev. 3d ed. 1981). Such is not the situation we deal with here.
In support of its position, the Department relies on United States v. 320.0 Acres of Land, 605 F.2d 762 (5th Cir.1979), which provided a detailed explanation of the "scope-of-the-project" rule. The Court said that the rule (1) protects the government from having to pay false, "hold-up" value attributable to the government's special need for particular property and (2) prevents the payment of compensation for value attributable to benefits conferred on the land (together with neighboring lands) by the proposed project for which the land is being taken.
We decline to adopt the scope-of-the-project rule. The constitution of Florida and the applicable statute control. Article X, section 6(a) of the Florida Constitution, provides: "No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry *307 of the court and available to the owner." Section 73.071(2), Florida Statutes (1975), provides: "The amount of such compensation shall be determined as of the date of trial, or the date upon which title passes, whichever shall occur first."
The constitutional requirement of full compensation means that the landowner must be completely paid for that which is taken, and compensated for the whole loss occasioned by the taking. Florida East Coast Railway v. Martin County, 171 So.2d 873 (Fla.), cert. denied, 382 U.S. 834, 86 S.Ct. 79, 15 L.Ed.2d 78 (1965); Meyers v. City of Daytona Beach, 158 Fla. 859, 30 So.2d 354 (1947). In most cases it will be necessary and sufficient to full compensation that the award constitute the fair market value of the property. Casa Loma Springs Development Co. v. Brevard County, 93 Fla. 601, 112 So. 60 (1927); Sunday v. Louisville & Nashville Railroad.
To accept the Department's argument that the 1973 sales were properly discarded because of awareness of the project (even though they took place prior to both the general and the specific announcements of the location of the route of Interstate 75 through Manatee County) would lead the courts of the state into inquiries for which there would be no clear lines of distinction. Before it was decided that Interstate 75 would traverse Manatee County, it had to be decided that the highway would extend into southwest Florida. Before it was decided that the highway would run through southwest Florida, a decision was made that it would enter the southern half of the Florida peninsula. Before it was decided that the highway would extend into southern Florida, there was a plan for an interstate limited access highway connecting Florida with the other states of the eastern United States, which would extend into central Florida from the north. The interstate highway system and proposals for its various routes have been under discussion for decades. Fixing the date when the scope of such a project was known in the market is a task much more easily discussed in theory than performed in deciding actual cases.
When a project such as a limited-access highway is announced and the general area through which it is to pass is known to the public, but the specific location is yet to be decided, there may well be marked increases in market values in the area due to the anticipation of the project, but these increases will result from a whole host of diverse influences and market forces. For example, once it became known that Interstate 75 was to be extended into southern Florida it could be assumed that it would be placed so as to serve the rapidly growing regions of the west coast, including Manatee and Sarasota Counties. Even this much general knowledge could have and probably did cause a general increase in land values, since good interstate highway access can make a region a more desirable place to live. Similarly, by making the Manatee-Sarasota area more accessible from the north by automobile, the highway (and anticipation thereof) probably stimulated all elements of the tourism industry, thereby also having an enhancing effect on land values generally. Thus it is very difficult to determine where to draw the line against value enhancement due to project anticipation when determining fair market value for compensation purposes.
In holding that a property owner is entitled to full compensation based on fair market value at the time of taking including increased value due to anticipation of the project, we of course do not mean to say that the state should have to pay inflated compensation based on false, "hold-up" value attributable purely to government demand for the particular parcel. It should remain open to the state to try to show through expert testimony that the valuation claimed by the landowner reflects false, "hold-up" value due purely to specific demand. But if the landowner, using established conventional appraisal methods, establishes fair market value of the land on the date of taking, the mere fact that it is greater than the value before the location of the project was announced or became *308 known does not deprive the landowner of the right to full compensation based on fair market value at the time of taking.
The general rule that the special need of the condemning authority should not be allowed to enhance the value of property for purposes of determining the compensation to be paid is but a corollary of the rule that compensation should be based on fair market value. The true market value of property is not likely to increase as a result of its being specifically targeted for condemnation. Indeed, as this Court recognized in State Road Department v. Chicone, 158 So.2d 753 (Fla. 1963), the more probable result is a decrease in value:
[W]hen land is definitely marked for condemnation . .. it shares none of the beneficial effects which could flow from anticipation of the proposed improvement for it will not be available for private use when the project is completed. Once selected for condemnation the marketability, both sale and rental, and to some extent the use, of property is sterilized and its value, either as determined by market value or use by the owner, is decreased. This decrease no doubt is in proportion to the lapse of time between the announcement that the lands will be taken and the actual taking. It is difficult to conceive of a situation in which property will increase in value because of the prospect of condemnation. A tenant's use of such property can only be temporary, and a purchaser would buy only an undetermined award in a condemnation suit.
158 So.2d at 754-55. The Court in Chicone held that when land specifically designated for condemnation depreciates in value after such designation but before the date of actual taking, the owner should be compensated on the basis of the market value prior to such depreciation. The decision was grounded in considerations of equity and fairness. This Court subsequently reaffirmed the principle of Chicone in Dade County v. Still, 377 So.2d 689 (Fla. 1979).
The record reveals that the landowners' tract (of which a part has been taken) and Creekwood were large parcels both of which were bisected by the construction of the north-south interstate highway. Both parcels were contiguous to existing roads which were to be connected to the limited-access highway by interchanges. When a state witness made reference to interchanges at trial, the landowners' counsel objected and the testimony was stricken. In its brief, the Department points out that property contiguous to an interstate highway at its interchanges or access points can be expected to greatly increase in market value because of its suitability for commercial use. Although the argument is not explicitly made, the Department seems to suggest that when part of an owner's land is taken for highway construction, but the owner is left with land adjacent to an interchange, the increase in the value of what he is left with justifies paying depressed value for the land taken. This is, of course, expressly forbidden by section 73.071(4), Florida Statutes (1975).
The landowners' parcel sold for $2,100 per acre in 1973. At the condemnation trial four years later the Department's expert appraised it at nearly $700 per acre less on the ground that the 1973 sale and another comparable sale reflected enhancement due to anticipation of the highway construction project. We hold that this testimony was based on an erroneous legal premise and should not have been allowed.
Consistent with Sunday v. Louisville & Nashville Railroad, we hold that if the 1973 sales of the landowners' property and Creekwood reflected market value that had increased because of public knowledge of the probable alignment of Interstate 75 in Manatee County, such was a natural increase in market value and was not to be disregarded or discounted in determining market value at the time of the taking.
The trial court erred in refusing to strike the testimony of the Department's appraisal witness because the testimony was based on a legal proposition which we, consistent with precedent, hold to be erroneous. The district court correctly so held in reversing the judgment. The decision of *309 the district court of appeal ordering a new trial is approved.
It is so ordered.
ALDERMAN, C.J., and ADKINS and SHAW, JJ., concur.
OVERTON, J., dissents with an opinion, in which McDONALD and EHRLICH, JJ., concur.
McDONALD, J., dissents with an opinion, in which OVERTON and EHRLICH, JJ., concur.
OVERTON, Justice, dissenting.
I strongly dissent. The majority opinion grants a substantial windfall to a select few landowners at the expense of the taxpayers of this state through a specious application of the constitutional phrase "full compensation." In doing so, the majority erroneously relies on an inapplicable decision of this Court which was written to construe a constitutional provision no longer in existence and which, when it did exist, applied only to private individuals and corporations. Regrettably, this opinion will have a major fiscal impact for years to come because it will require the state to pay untold millions as a premium in compensation for increases in property value caused solely by the government's proposed improvement for which the property was taken. This opinion will necessarily result in an increase in the cost of government improvements and will possibly thwart the development of some public projects because of the decline in available taxpayer funds with which to pay the increased compensation required.
In reaching their decision, the majority placed major reliance on Sunday v. Louisville & Nashville Railroad, 62 Fla. 395, 57 So. 351 (1911). That decision involved a private corporation and the construction of article XVI, section 29 of the 1885 Constitution. That constitutional provision clearly applied only to a "corporation or individual" and clearly stated that the compensation for property taken should be calculated "irrespective of any benefit from any improvement proposed by such corporation or individual." This section is no longer included in our constitution. Even before it was eliminated, however, this Court held, in Daniels v. State Road Department, 170 So.2d 846 (1964), that section 29 of article XVI of the 1885 Constitution did not apply to governmental bodies. Further, the Daniels court upheld section 73.10(3), Florida Statutes (1959), which allowed the state to offset the enhancement in value of the remaining property caused solely by the construction of the improvement, against the damage resulting to the remaining property by reason of the improvement. The majority did not recede from Daniels and as a result we find ourselves in a position where enhancement caused by the improvement may properly be considered in determining the value of damage to the remaining property although it is not proper to consider such enhancement when determining compensation due for the land taken.
There is no logic in the majority opinion which, on the one hand, allows consideration of depreciation brought about by anticipation of the governmental project and the imminent taking of the land and, on the other hand, disallows consideration of enhancement attributable to that same anticipation of the governmental project. See State Road Department v. Chicone, 158 So.2d 753 (Fla. 1963). The majority clearly does not believe that appreciation and depreciation in value brought about solely by the anticipated project should be a two-way street. The "scope-of-the-project" rule balances the rights of all parties and treats appreciation and depreciation in the same manner.
I fully concur with Justice McDonald's dissent and believe the scope-of-the-project rule is a proper, fair, and equitable method for determining full compensation for both the land taken and the damage to the remaining property.
The majority, by judicial fiat, has read into our present constitutional provision a directive that a property owner is entitled, as a matter of right, to have the government *310 pay, in addition to the true market value, the enhancement in that value brought about solely by the government project proposed. This is an extremely strained interpretation of "full compensation" as it appears in section 6 of article X of the Florida Constitution. By so doing, the majority has adopted what is clearly the minority view in this country.
The majority opinion is a property owner's bonanza and a taxpayer's nightmare. There is no constitutional justification for the majority's view. The district court's decision should be disapproved and we should adopt the scope-of-the-project rule for determining full compensation.
McDONALD and EHRLICH, JJ., concur.
McDONALD, Justice, dissenting.
I dissent. Not allowing DOT's expert to exclude property with inflated prices due to an expectation of the proposed project from his opinion of market value allows the Nalvens to reap a windfall profit at the unwarranted expense of the taxpayers of this state.
In Sunday v. Louisville & Nashville Railroad, 62 Fla. 395, 57 So. 351 (1912), this Court reversed a condemnation award and remanded for a new trial on compensation because the trial court had instructed the jury not to consider any enhancement in the value of the property taken by the proposed improvement. This holding arose from the Court's interpretation of article XVI, section 29 of the 1885 Constitution which provided for full compensation in eminent domain proceedings "irrespective of any benefit from any improvement proposed by [the appropriating] corporation or individual." The Court also relied on section 2013, Florida Statutes (1906), which tracked the language of article XVI, section 29.
The constitutional and statutory language relied on in Sunday, however, no longer exists. Art. X, § 6(a), Fla. Const. Relying on an outdated case which interprets currently nonexisting law is unwarranted. Florida's position on this matter, as enunciated in Sunday, is in the minority, Annot., 147 A.L.R. 66 (1943), and DOT argues convincingly that we should join the nationwide majority of jurisdictions and adopt the "scope-of-the-project rule."
The Fifth Circuit Court of Appeals has stated the scope of the project rule:
If the condemned land was probably within the scope of the governmental project for which it is being condemned at the time the Government became committed to that project, then the owner is not entitled to any increment in value occasioned by the Government's undertaking the project.
United States v. 320.2 Acres of Land, 605 F.2d 762, 781-82 (5th Cir.1979). This rule had previously been adopted by the United States Supreme Court in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed.2d 336 (1943). The fifth circuit has also outlined several reasons supporting the rule:
At least three considerations support this principle excluding from compensation "value resulting from the government's special or extraordinary demand for the property"  value that is caused solely by the Government's actions as taker of the condemned property. First, this value is not true "market value" as determined by what a willing buyer would pay a willing seller under "fair market conditions." The Government has entered the "market" as a "purchaser" with a unique and pressing demand, and in so doing has distorted the market; absent the Government's activity as "purchaser" or condemnor, there would be no market reflecting this unique demand. That element of value created solely by the Government's activity as purchaser or condemnor is more "hold-up value" than "fair market value." Second, to force the Government to pay, because of a special public need for property, a premium over that which the property would bring on the open market absent the Government's demand, obviously would increase the cost of public projects and perhaps frustrate some public *311 objectives. Third, to permit recovery of value that is not created by fair, open market conditions would be to award a few private propertyholders windfall gains solely because of public needs and exigencies. The underlying notion of the "no value attributable to Government demand" principle, then, is that the Government, when pursuing public benefits through its condemnation power, should not have to spend more for property than would a reasonable and willing private purchaser solely because it is exercising its condemnation power on behalf of the public; instead, the Government is to be equated to a private purchaser buying the property for its "highest and best" nongovernmental use in an open market.
605 F.2d at 782-83 (emphasis in original, footnotes and citations omitted). The fifth circuit's observations point up the inequity in the present case.
This Court previously applied the scope of the project rule in State Road Department v. Chicone, 158 So.2d 753 (Fla. 1963), when it held that, in appropriate circumstances, the effect on property values of the prospect of a taking should be disregarded. In Chicone the appropriate circumstances were that the prospective taking would decrease, rather than increase, property values. Other courts, unlike this Court, have recognized that inflated values are just as impermissible as deflated ones.
The [Supreme] Court early recognized that the "market value" of property condemned can be affected, adversely or favorably, by the imminence of the very public project that makes the condemnation necessary. And it was perceived that to permit compensation to be either reduced or increased because of an alteration in market value attributable to the project itself would not lead to the "just compensation" that the Constitution requires.
United States v. Reynolds, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970) (footnotes omitted). Considerations of equity and fairness require that taxpayers not be treated differently than private property owners.
In the instant case applying the scope of the project rule would give the Nalvens their just compensation, rather than more than their just compensation at the taxpayers expense. This case presents us with the opportunity to correct a gross inequity in the law of eminent domain. We should accept the suggestion of Judge Grimes of the Second District Court of Appeal to do so.
OVERTON and EHRLICH, JJ., concur.
NOTES
[1] At the time of the Sunday decision, article XVI, section 29 of the Florida Constitution of 1885 provided:

Section 29. No private property, nor right of way shall be appropriated to the use of any corporation or individual until full compensation therefor shall be first made to the owner, or first secured to him by deposit of money; which compensation, irrespective of any benefit from any improvement proposed by such corporation or individual, shall be ascertained by a jury of twelve men in a court of competent jurisdiction, as shall be prescribed by law.
[2] Until the Daniels decision dispelled the confusion, this Court had frequently treated the "full compensation" requirement of article XVI, section 29 as applicable to condemnations by both private persons and public agencies. See, e.g., Jacksonville Expressway Authority v. Henry G. DuPree Co., 108 So.2d 289 (Fla. 1958); Meyers v. City of Daytona Beach, 158 Fla. 859, 30 So.2d 354 (1947).
[3] Article X, section 6, Florida Constitution, provides:

(a) No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.
(b) Provision may be made by law for the taking of easements, by like proceedings, for the drainage of the land of one person over or through the land of another.
[4] The pertinent paragraph of the Sunday opinion reads as follows:

The constitution contemplates and the statute requires that the issue submitted shall be what is "full compensation" for the property to be appropriated at its then fair actual value, irrespective of or without regard to any benefits that may accrue to the owner of the property from any improvement proposed by the petitioner; but the law does not deny to the owner any real and reasonable enhancement in the market value of the property to be appropriated by reason of "any improvement proposed." If the property naturally, or in common with other property similarly conditioned, increases in market value in anticipation of the proposed improvement, before the appropriation, the compensation therefor is the fair actual market value at the time of the lawful appropriation. Giesy v. Cincinnati, Wilmington & Zanesville R.R. Co., 4 Ohio St. 308, text 331; Lewis on Em. Dom. (3d Ed.), Secs. 695 and 7457, and authorities cited; Chicago K. & W.R. Co. v. Parsons, 51 Kan. 408, 32 Pac.Rep. 1083; Newgrass v. Railway Co., 54 Ark. 140, 15 S.W.Rep. 188.
62 Fla. at 397, 57 So. at 351.
[5] Contrary to the suggestion that there is no longer any statute of the same import, section 73.071(4), in cases of certain takings by public bodies, allows enhancement in the value of remainder lands to be offset against remainder damages, but disallows any such offset against the compensation paid for the land taken:

(4) When the action is by the Division of Road Operations, county, municipality, board, district or other public body for the condemnation of a road, canal, levee or water control facility right-of-way, the enhancement, if any, in value of the remaining adjoining property of the defendant property owner by reason of the construction or improvement made or contemplated by the petitioner, shall be offset against the damage, if any, resulting to such remaining adjoining property of the defendant property owner by reason of the construction or improvement, but such enhancement in the value shall not be offset against the value of the property appropriated, and if such enhancement in value shall exceed the damage, if any, to the remaining adjoining property there shall be no recovery over against such property owner for such excess.
The present case, of course, presents no issue of remainder damages or remainder value enhancement.